UNITED STATES GYPSUM COMPANY,
Plaintiff,

v.

Frances UHLHORN, Defendant.

No. J 61 C 21.

United States District Court
E. D. Arkansas,
Jonesboro Division.

Aug. 19, 1964.

George K. Cracraft, Jr., Helena, Ark., John Montedonico of Montedonico, Boone, Gilliland, Heiskell & Loch, Memphis, Tenn., W. H. Daggett of Daggett & Daggett, Mariana, Ark., for plaintiff.

Joe Barrett of Barrett, Wheatley, Smith & Deacon, Jonesboro, Ark., Walter P. Armstrong, Jr., of Armstrong, McCadden, Allen, Braden & Goodman, Memphis, Tenn., for defendant.

YOUNG, District Judge.

This diversity of citizenship litigation was filed in this Court by the plaintiff United States Gypsum Company, an Illinois corporation with its principal place of business outside Arkansas, by way of a suit to quiet title to land alleged to have arisen as an island from the bed of the Mississippi River within the State of Arkansas. The defendant Frances Uhlhorn, a citizen and resident of the State of Tennessee, was made a party defendant and service on her was obtained under Rule 4(e) of the Rules of Civil Procedure.

After the pleadings were made up it became apparent that the appointment of a Special Master was necessary and, by agreement of the parties, Honorable Richard B. McCulloch, an attorney of Forrest City, Arkansas, was appointed. After the taking of the proof was concluded,[1] he filed an excellent and exhaustive report in which his findings of fact are clearly set forth in detail. In applying his conclusions of law to the facts, he concluded that the lands in controversy arose from the bed of the Mississippi River in the State of Tennessee and that this Court was without jurisdiction. The effect of this conclusion was to rule in favor of the defendant Frances Uhlhorn.

The matter is now before the Court by way of objections to the Master's Report. The objections of both parties relating to the sufficiency of the evidence to sustain the Master's findings of fact are overruled. The objections of both parties to the Master's conclusions of law raise the following issues:

ISSUES

I. Does a state line follow a shift in the thalweg, or middle of the main channel of navigation of a navigable river around a sand bar which is below the ordinary high water mark? (This issue involves an application of federal law and will be discussed hereinafter under the title "The State Line.")

II. The effect of a statutory change in the method of sale of islands belonging to the State of Arkansas upon the accrued or vested right of a prior applicant to purchase said lands at their appraised value. (This issue involves an application of both state and federal law and will be discussed hereinafter under the title "Act 452 of 1959.")

III. The capacity of a third person to make a collateral attack on the validity of an island deed issued by the State of Arkansas. (This issue involves an application of state law.)

IV. The accuracy of the Rodgers' Survey.

I. *The State Line*

As a result of the avulsion in this area in 1876 and the decision of the United States Supreme Court in Arkansas v. Tennessee, 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 638 (1917), Brandywine Island, Arkansas, was, during the time pertinent to the issues involved in this litigation, on the left (or east) bank of the Mississippi River, and Centennial Island, Tennessee, was on the right (or west) bank. The three freehand drawings showing the stages of the River with reference to the tract of land in dispute for the years of 1935, 1937, and 1939 are inserted to assist in better understanding the facts.

---

1. The transcript of the record contains 2,130 pages of testimony and 99 exhibits.

The portions of the Master's Report which show how the land in controversy was formed and the ultimate result of the Master's conclusions of law from such facts are set out as follows:

"According to the preponderance of the evidence, the subject new land has been built principally of dredge spoil. This land is located between the northwest front of Brandywine Island and the east front of Centennial Island. In 1930, the River flowed from the north and east around the north end of Brandywine Island, counter-clockwise, and then down the west side of that Island, and east of Centennial Island. For some years prior to that time, the River had been migrating north and west, cutting deeper and deeper into the east face of Centennial Island. While this was going on, accretions to Brandywine Island, known as Massey Bar, formed on the left descending bank of the River.

"In addition to natural conditions accompanying the flow of the River, pertinent factors concerning the origin of the new land area are the artificial conditions which were created by the U. S. Corps of Engineers. These artificial elements working in the channel of the River were principally dredges. They were attempting to maintain a navigable channel through or across the reef which separated the upper pool along the north front of Brandywine Island from the deep pool which lay along the south front of the lower Centennial Island. This reach of channel was known and recorded as 'Happy Valley Crossing.'

"In 1930, 423,982 cubic yards of materials were dredged in maintaining the channel over this crossing. The dredged materials were discharged downstream from the cut on the out-board or distal end of the nucleus accretions to Massey Bar— in the geographic area now occupied by the lands in controversy. The building of this discharged bar below the axis of the 1930 channel tended to reduce the impingement of the current on the rapidly caving bank in the upper end of Centennial Bend, but the River continued to move north and west. In 1931, further dredging was undertaken, with the dredge spoil being added to that of the previous year in the same area.

"The normal development of a natural meander loop was prevented by the artificial stabilization of the caving bank of Centennial Island. The Tennessee land on Centennial Island was protected from further recession, and the accretions to Brandywine Island could not further advance. During 1932, additional dredging was done, and this dredge spoil was added to the subject area.

"During the high water season of 1933, the United States Dredge Zeta was employed to open a channel across the point of the nucleus accretions to Massey Bar—that is, between the existing discharge bar and the Arkansas mainland on Brandywine Island (which, at this point, was on the left descending bank of the River). This was the first man-made attempt to open what has been referred to throughout this case as the 'point-way' channel. Also, throughout the case, the old channel around the west side of the subject lands is referred to as the 'bendway' channel. It is the land between the 'bendway' and 'pointway' channels that is the subject of this litigation.

\*    \*    \*    \*    \*    \*

"In 1934 dredging operations continued, with dredged materials being placed in the subject area. The continuing approach of the nucleus Massey Bar accretions upon the revetment on the right bank of the River is shown upon a map of a channel survey made by the Engineers during the low water season of 1935. Again in 1936, dredges were employed to open a 'pointway' channel across the Massey Bar accretions while the river traffic was routed

through the 'bendway' channel. Some maintenance dredging was done at the head of the 'bendway' channel.

"Following the flood of 1937, 321,-895 yards of material were dredged in furthering the attempts to open the new 'pointway' channel. Part of this material was discharged across the head of the natural channel in the bend; that is, the foot of Corona Bar and the head of the nucleus Massey Towhead were connected by a sand dam in an attempt to concentrate the entire flow of the River through the artificial 'pointway' channel.

"The dam was unsuccessful and navigation continued through the 'bendway' channel as the caving of Centennial Bend was resumed. The volume of water diverted through the 'pointway' channel was gradually increasing during this period, but the flow had not yet reached appreciable proportions. By this time, the Massey Towhead (Uhlhorn Bar) composed largely of dredge spoil, had become a sizable land formation.

"The development of the 'pointway' channel was accelerated to some degree by a natural 'scouring' operation of the River itself.

"In the Spring of 1938, the 'pointway' channel was marked for navigation by the placing of buoys and lights, and the marks for running this channel were described and published in the 'Notice to Masters and Pilots' by the U. S. Coast Guard.

"The weight of the evidence reflects that, as late as December, 1937, the main channel of navigation of the Mississippi River was through the 'bendway channel.' The weight of the evidence also reflects that the channel shifted to the 'pointway' channel between that time, and May 6, 1938. The evidence also reflects that the main channel of navigation never shifted back from the 'pointway' to the 'bendway' after May 6, 1938, although navigation was maintained in the former channel for some time only by the use of dredges by the Corps of Engineers.

"Even after May, 1938, there was a relatively deep channel through the 'bendway,' and river traffic sometimes used that channel, although it was not the main channel of navigation. As late as 1939, there were depths at certain points in the 'bendway' of 25 feet.

"Traffic was maintained through the 'pointway' channel during 1940, and during that time 555,741 cubic yards of materials were dredged. Part of this was placed in the head of the old 'bendway' channel in an effort to close all its flow and concentrate an undivided river through the 'pointway' channel. The abandoned bend was not sounded during the year. Navigation was routed through the 'pointway' channel during 1941 without the aid of dredging. Records of depths in the 'bendway' channel were not kept in 1941 or for any year thereafter. The old 'bendway' channel had been abandoned, although water continued to flow through it for some years thereafter.

"During this period also, a new channel of the River was beginning to develop east of the 'pointway' channel, and the River subsequently abandoned the 'pointway' channel for this new channel through Brandywine Chute. This latter channel is the main channel of navigation at the present time, but the development of that latter channel is not relevant to a decision of the issues in this case. It is the change of the channel from the 'bendway' channel to the 'pointway' that concerns us here.

. \* \* \* \* \* \*

"I am convinced that, insofar as the time element is concerned, that the shift of the Mississippi River from the 'bendway' to the 'pointway' meets the necessary requirement of an avulsion. This is so whether the change be treated as an avulsion, or

whether it was a 'shift around an island.' In other words, the fact that the processes which brought about the change took place over a period of several years, would not keep the change from being one or the other.

\*    \*    \*    \*    \*    \*

"Plaintiff states in its brief that the 'important thing is that the bar was there on the Arkansas side of the thalweg and the thalweg shifted around it by change of channel and not through it by erosive process. When it arose on the Arkansas side, it was Arkansas, whether it was above or below the high water mark or ordinary low water \*  \*  \* or whether vegetated or not. The only way the Arkansas title \*  \*  \* could have been destroyed was by migration of the channel eroding the intervening area away. This it did not do. The River abandoned its old thalweg in favor of the new one leaving the intervening area submerged only at 14 feet on the Memphis gauge and its abandoned thalweg intact.

"Plaintiff is correct in that the River did not erode away the intervening area. I am of the opinion that this fact was not controlling. My conclusion, as set out more fully earlier in this Report, is that when the shift took place within the bed of the River (which was below the mark of ordinary high water), the rules of avulsion did not come into play. The effect of this finding is that the State line shifted with the change of channel just as if it had eroded the intervening land away.

"Plaintiff argues that the line remains the same unless the River erodes away all intervening land (including bars, reefs, etc.). The answer to this is that the cases do not hold this. They might well have held it, but they have not done so. *My conclusion of law from the cases is that there cannot be an avulsion within the bed of the river.* If I am incorrect in this, then my result is not correct. This is because there is no doubt that Plaintiff's position as to the manner in which the change took place is correct; that is, it was an avultive process, and it did shift around the area in controversy." (Emphasis added)

In Arkansas v. Tennessee, 246 U.S. 158, 169, 38 S.Ct. 301, 303, 62 L.Ed. 638, the Supreme Court of the United States, in locating the state line between Arkansas and Tennessee as the thalweg, stated the reason therefor as. follows:

"\*  \*  \* From a review of the authorities upon international law, it was declared that when a navigable river constituted the boundary between two independent States the interest of each State in the navigation, and the preservation by each of its equal right in such navigation, required that the middle of the channel should mark the boundary up to which each State on its side should exercise jurisdiction; that hence, in international law, and by the usage of European nations, the term 'middle of the stream,' as applied to a navigable river, meant the middle of the channel of such stream, and that in this sense the terms were used in the treaty between Great Britain, France, and Spain, concluded at Paris in 1763, so that by the language 'a line drawn along the middle of the River Mississippi,' as there used, the middle of the channel was indicated; that the *thalweg*, or middle of the navigable channel, is to be taken as the true boundary line between independent States for reasons growing out of the right of navigation, in the absence of a special convention between the States or long use equivalent thereto; and that although the reason and necessity of the rule may not be as cogent in this country, where neighboring States are under the same general government, yet the same rule must be held to obtain \*  \*  \*."

With respect to the effect of a change or shift of the thalweg of a navigable

stream constituting a boundary between two states, the Supreme Court in Arkansas v. Tennessee, 246 U.S. 158, 173, 38 S.Ct. 301, 304, 62 L.Ed. 638, also said:

"It is settled beyond the possibility of dispute that where running streams are the boundaries between States, the same rule applies as between private proprietors, namely, that when the bed and channel are changed by the natural and gradual processes known as erosion and accretion, the boundary follows the varying course of the stream; while if the stream from any cause, natural or artificial, suddenly leaves its old bed and forms a new one, by the process known as an avulsion, the resulting change of channel works no change of boundary, which remains in the middle of the old channel, although no water may be flowing in it, and irrespective of subsequent changes in the new channel * *."

In Nebraska v. Iowa, 143 U.S. 359, 365, 12 S.Ct. 396, 398, 36 L.Ed. 186 (1892), the United States Supreme Court in distinguishing the gradual process of accretion and the sudden process of avulsion and their effect on a state line, said:

"If a territory which terminates on a river has no other boundary than that river, it is one of those territories that have natural or indeterminate bounds, (territoria arcifinia,) and it enjoys the right of alluvion; that is to say, every gradual increase of soil, every addition which the current of the river may make to its bank on that side, is an addition to that territory, stands in the same predicament with it, and belongs to the same owner. For, if I take possession of a piece of land, declaring that I will have for its boundary the river which washes its side, or if it is given to me upon that footing, I thus acquired beforehand the right of alluvion; and, consequently, I alone may appropriate to myself whatever additions the current of the river may insensibly make to my land. I say 'insensibly,' because, in the very uncommon case called 'avulsion,' when the violence of the stream separates a considerable part from one piece of land and joins it to another, but in such manner that it can still be identified, the property of the soil so removed naturally continues vested in its former owner. The civil laws have thus provided against and decided this case when it happens between individual and individual. They ought to unite equity with the welfare of the state, and the care of preventing litigations."

In Commissioners v. United States, 270 F. 110, 113 (8th Cir. 1920), the court considered the effect of a shifting of the thalweg of the Arkansas River around an island from south to north, and concluded:

"The general rule on this subject is: (1) That where the thread of the main channel of the river is the boundary between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel; (2) but, where it changes by the sudden and violent process of avulsion, the boundary remains where the main channel was at the time of the avulsion, subject always to such changes as may be wrought after the avulsion by accretion or erosion while the old channel is occupied by a running stream. Counsel rely upon the first clause of this rule. That clause is applicable to and governs cases where the boundary line, the thread of the stream, by the slow and gradual processes of erosion and accretion creeps across the intervening space between its old and its new location. To this rule, however, there is a well-established and rational exception. It is that, where a river changes its main channel, not by excavating, passing over, and then filling the intervening place between its old and its new main channel, but

by flowing around this intervening land, which never becomes in the meantime its main channel, and the change from the old to the new main channel is wrought during many years by the gradual or occasional increase from year to year of the proportion of the waters of the river passing over the course which eventually becomes the new main channel, and the decrease from year to year of the proportion of its waters passing through the old main channel until the greater part of its waters flow through the new main channel, the boundary line between the states remains in the old channel subject to such changes in that channel as are wrought by erosion or accretion while the water in it remains a running stream." (Citations omitted)

In Davis v. Anderson-Tully Co., 252 F. 681, 685 (8th Cir. 1918), the court applied the same rule announced in Commissioners v. United States, supra, to a boundary dispute involving the state line between Arkansas and Mississippi.

■ The authorities therefore appear to be uniform in holding that the state line, located in the thalweg, or the middle of the main channel of navigation of a navigable river only moves with those changes in the thalweg which occur when the river through natural processes, excavates, passes over, and then fills the intervening space between its old and its new main channel, i. e., changes made by the slow and natural processes of accretion.

That the state line between Arkansas and Tennessee did not shift from the bendway channel to the pointway channel can also be demonstrated upon the theory of vested property rights.

■ In City of St. Louis v. Rutz, 138 U.S. 226, 247, 11 S.Ct. 337, 345, 34 L. Ed. 941 (1890), the Supreme Court of the United States in discussing the relative

rights of owners with respect to navigable rivers said:

"It is well settled that an owner in fee of the bed of a river, or other submerged land, is the owner of any bar, island, or dry land which subsequently may be formed thereon. * * * * "

■■ It is also well settled that the State of Arkansas, unlike some states,[2] owns the bed of the Mississippi along her borders from the thalweg to the point of ordinary high water mark. Winford v. Griffin, 1 F.2d 224 (8th Cir. 1924).

Furthermore, the court in Whiteside v. Norton, 205 F. 5 (8th Cir. 1913), after pointing out that Congress, without the consent of the states involved, could not change the boundary between them, said:

"The Supreme Court of Wisconsin in State v. Bowen, 149 Wis. 203, 135 N.W. 494, 39 L.R.A. (N.S.) 200, restates the settled rules governing changes of boundary by erosion or accretion, and declares that states and individuals are subject alike to such losses and gains, but that neither can have the boundaries of his domain changed by avulsion nor by diversion of the water effected by human agencies. Under the conditions here presented the law of Wisconsin had already determined the right of ownership in this island before the improved channel was established. * * *

* * * * * *

"In this case, then, the government had the right to make the channel improvement that it did make. It used such parts of the river bed as it needed to use, cutting away the sandbars and small islands that were regarded as obstructions to navigation, including parts of the island in controversy. In so doing it aimed to take, and did take, no property from

---

2. In Arkansas a riparian owner only holds to the high-water mark; in Tennessee a riparian owner holds to the low water mark; but in some other states a ripar-

ian owner holds to the thalweg; Winford v. Griffin, supra; Goodall v. Herbert & Sons, 8 Tenn.App. 265 and St. Louis v. Rutz, supra.

complainant. Thus far the complainant had no rights in this island. The government might, perhaps, have taken this entire Tallas Island for the necessities of navigation, but it did not do so; consequently title to that portion which was left, after cutting the new channel, remained in Whiteside as before. The effect of complainant's contention is that this act of sovereignty created in him, as against the defendants, a proprietary right, which had no previous existence. This position seems to be in hopeless conflict alike with reason and authority. We cannot agree that human agencies can thus suddenly bring about what like acts of nature admittedly cannot accomplish. Cutting this channel was analogous to avulsion; it could not operate to change the boundary between the states of Wisconsin and Minnesota. * * * "

In Nebraska v. Iowa, 143 U.S. 359, 365, 12 S.Ct. 396, 398, 36 L.Ed. 186 (1892), it is said:

" * * * when the violence of the stream separates a considerable part from one piece of land and joins it to another, but in such manner that it can still be identified, the property of the soil so removed naturally continues vested in its former owner. * * * " (Emphasis added)

By analogy, therefore, this Court concludes: (1) That the sand bar, herein referred to as Massey Bar, arose from the river bed on the Arkansas side of the thalweg before any work was done by the Corps of Engineers in 1933; (2) that the state line between Arkansas and Tennessee was in the "bendway" channel before May 6, 1938, and that because of the nature of the shift in the channel the state line remained in the "bendway"

channel; (3) that the change of the thalweg of the river was such that the sand bar, known as Massey Bar, was still identifiable after the shift to the "pointway" channel; and (4) since the State of Arkansas was the owner in fee of the bed of the river where the bar formed and subsequently emerged, title to the bar was in the State until it conveyed its interest.

From this it follows that the Special Master was in error in determining that the land was in the State of Tennessee and that this Court was without jurisdiction.

### II.  Act 452 of 1959

Prior to March 30, 1959, the law of Arkansas (Act 282 of 1917 and Act 192 of 1945)[3] provided that a person desiring to purchase an island could do so by filing application with the Commissioner of State Lands and making a deposit of money sufficient to cover the Commissioner's estimated cost of a survey of said lands. Upon the application being filed the Commissioner was required to direct a survey of said lands, the cost of which was to be paid from the funds deposited; to cause an appraisal of the lands to be made; to notify the applicant of the completion of the survey and the appraisal price; and to issue the applicant, upon receipt of the appraised price,[4] a deed conveying all interest of the State of Arkansas.[5] The Commissioner was given authority to determine preference rights between applicants which he did, according to the findings of the Special Master, upon a first come first serve basis. In 1959 the Arkansas General Assembly passed Act 452 of 1959 [6] which repealed all prior laws and provided as follows:

"Whenever application is made with the Commissioner of State Lands for the purchase of any character of lands as described in Section

---

3.  Ark.Stat.Ann. § 10–601—607 (Repl. 1956).

4.  The applicant was given credit on the appraised price for the deposit made by him to cover the survey costs.

5.  The Commissioner was given some discretion over matters not here involved.

6.  Ark.Stat.Ann. § 10–602 (Supp.1963).

1, hereof, said Commissioner shall thereupon direct the county surveyor of the county in which the lands are located, or some other competent surveyor, to accurately survey said lands and compile the field notes and plat the same in reference to the survey of adjacent lands, by the extension of township, range and section lines. Thereafter said lands shall be appraised and treated in all respects as and sold and conveyed by the State in the same manner that lands forfeited to the State for the nonpayment of taxes are now, or may hereafter be sold by the State. The cost of surveys made pursuant to this Act shall be added to the purchase price of any such lands sold."

The Special Master found that plaintiff's predecessor in title, Mr. O. O. Emmons, had made application and deposited the estimated cost of the survey in 1952, that the survey was completed and filed with the Commissioner of State Lands on December 6, 1958, but that the appraisal and deed were not made and issued until after the effective date of said Act 452 of 1959. He further found that on the face of the deed it is shown that the Commissioner of State Lands did not purport to comply with the said Act 452 of 1959 in issuing the deed to the island.

Clearly, a statute under the laws of Arkansas will not be given a retroactive effect if it is susceptible to any other construction. Kansas City Southern Ry. Co. v. McDaniel, 131 F.2d 89 (8th Cir. 1942). Furthermore, the presumption is that a repeal of a statute does not invalidate the accrued result of its operative tenure. Chism v. Phelps, 228 Ark. 936, 311 S.W.2d 297, 77 A.L.R. 2d 329 (1958). Therefore, the Court is of the opinion that the Special Master was correct in concluding that said Act 452 of 1959 only applied prospectively and did not affect the application filed under the prior law.

Furthermore, the Court is of the opinion that plaintiff's predecessor had a vested right which the repeal of the law could not affect. See Pennoyer v. McConnaughy, 140 U.S. 1, 11 S.Ct. 699, 35 L.Ed. 363 (1890), and Baldwin v. Cross, 5 Ark. 510 (1843).

### III. *The Island Deed*

Defendant Frances Uhlhorn, in addition to attacking the validity of the island deed issued to plaintiff's predecessor in title for its failure to comply with said Act 452 of 1959, a matter appearing on the face of the deed itself, also attacks the deed because the surveyor appointed by the Commissioner did not establish meander lines and because his field notes were not on file with the Commissioner of State Lands at the time the deed was issued, all as required by Ark.Stats. § 10–601 to § 10–607.

The attack here made on the island deed is in the nature of a collateral attack and the Court is of the opinion that the Special Master was correct in holding that the defendant, standing in the position of a third person, could not make such an attack on the deed. See Conway v. Shuck, 203 Ark. 559, 157 S. W.2d 777 (1942), holding that a squatter on an island had no right to attack the validity of an island deed issued by the State of Arkansas.

### IV. *The Rodgers' Survey*

On December 26, 1952, O. S. Rodgers was appointed by the Land Commissioner of the State of Arkansas as Special State Surveyor to survey the land in question in accordance with statutory requirements. On December 6, 1958, Rodgers filed his report with the Land Commissioner and furnished the necessary legal description of the land surveyed.

Rodgers testified as a witness for plaintiff in this case and the correctness of his survey has been made an issue by defendant.

The Master found the Rodgers survey to be accurate, saying:

"The evidence reflects, and I so find, that O. S. Rodgers made a care-

**1004**

ful and deliberate survey of the area in question. The results of that survey are in this record, and various aspects of it appear in the testimony and exhibits from the beginning to the end of this record. The survey satisfied the State Land Commissioner of Arkansas that it was accurate. While it was subjected to criticism on certain specific points by Defendant's witnesses, these criticisms have not, in my opinion, destroyed its overall and basic accuracy. There is the contention by Defendant's witnesses that, using the Rodgers figures, the thalweg of the old channel would run up onto a concrete revetment which the evidence reflects is situated along the outside of the old bendway channel. My finding is that it would not do this, and Rodgers did not intend for it to do this. * * *

"The line, as established by Rodgers, is somewhere in the old bendway channel, between the revetment and the opposite shore of the old channel—its exact location must be determined from the survey itself.

" * * * But it is my conclusion that, despite certain minor variations, the Rodgers survey is reliable. Certainly it is true that the Rodgers survey is sufficiently reliable for the State's deed to have conveyed title to the lands described, provided the State had such title, and provided other requirements were met."

■ The Court is of the opinion that the evidence supports the Master's finding, and affirms his conclusion as to the accuracy of the Rodgers' survey.

### CONCLUSION

The Master's Report, insofar as it determined the legal issues in favor of the defendant, is hereby set aside.

A decree will be entered by this Court quieting and confirming title to the island in the plaintiff, free and clear of any right, title, claim or interest of the defendant or any person claiming by or through her.