## STATE v. ROLIO.

No. 4575.   Decided November 25, 1927.   Rehearing Denied December 21, 1927.   (262 P. 987.)

*Harvey H. Cluff*, Atty. Gen., and *J. Robert Robinson*, Asst. Atty. Gen., for the State.

*George Y. Wallace*, of Salt Lake City, for respondent.

*Ball, Musser & Mitchell*, of Salt Lake City, amici curiae.

STRAUP, J.

This action was brought by the state to quiet title to a portion of the bed of Utah Lake, a fresh and navigable body of water. The court below sustained a general demurrer to the complaint. The state appeals.

In the complaint it is alleged that in 1879 the government of the United States granted to Andreas Hansen a patent to all of lots 1, 2, and 3, section 5, township 7 south, range 1 east, Salt Lake meridian. No further description of the granted lots is set forth. In the description no reference is made to the lake or that the lots extended to the meander line or water's edge of the lake. It is further alleged that the defendant, by mesne conveyances, long prior to the commencement of the action, became the owner of the land described in the patent; that, when the patent was issued, and when Utah in 1896 was admitted into the Union, the land described was riparian land, located along, and contiguous to, the then existing water's edge of the lake, in the county of Utah, state of Utah; that the lake is an inland, and a fresh and navigable, body of water, wholly within the borders of the state, unaffected by tides, and navigated by boats carrying freight and passengers; that, prior to the commencement of the action, and since Utah was admitted into the Union, pumping operations were carried on by divers persons and corporations on the lake whereby large quantities of water of the lake were removed, and the level of the lake thereby lowered, so that portions of the bed of the lake became unwatered, and the dry land rendered susceptible of farming and pasturage; that among such unwatered portions of the bed of the lake was an irregular strip running west 38 rods, south 80 rods, west 10 rods, south 80 rods, west 80 rods, to the water's edge of the lake, and thence north, following the water's edge to the place of beginning; that such strip is located between the land described in the patent and the present water's edge of the lake, but, when the patent was issued and Utah admitted into the Union,

such strip was covered by the waters of the lake, "but because of said operation of said pumps, and not by accretion or reliction, the said strip became unwatered, and dry land suitable for farming and pasturage."

It is then further alleged that, pursuant to the enabling act approved 1894, Utah was admitted into the Union in January, 1896, on an equal footing with the original states, and that, upon its admission into the Union, it became "vested with the fee-simple title to the beds of all navigable waters located within its boundaries, including the entire bed of Utah Lake, and that it at all times since was and now is the owner in fee simple, in possession and entitled to the sole possession and the exclusive use, possession, and enjoyment of all said lands, 'described in the strip,' and of all other lands constituting the bed of said lake and located opposite said land" described in the patent. Then it is alleged that the defendant, as a riparian owner of land located contiguous to the lake, claims an estate and title to the bed of the lake and to the center of it, including the strip lying between the present water's edge of the lake and the land described in the patent, and that the defendant asserts that the state at no time acquired any, and that it had no right, title, or interest in or to the bed of the lake, but that such right, title, and interest to the center of the lake belonged to, and vested in, riparian owners of lands bordering on the lake; but the state further alleged that such claim of title on the part of the defendant was unfounded, and reasserted its own right, title, and interest in and to the whole of the bed of the lake, including the strip heretofore referred to, and prayed that the defendant be required to set forth whatever claim or interest he has, and that it be adjudged that his claim is groundless and unfounded.

It will be observed that in the complaint it is not averred that the defendant claimed title or possession of the strip, or of any unwatered land, under the doctrine or because of accretion or reliction, but on the ground that the defen-

dant, as a riparian owner of land bordering on the lake, owned the bed of the lake oposite his land to the center of the lake, including the strip.

The demurrer, for purposes of the demurrer, of course admitted all the material allegations well pleaded in the complaint. Therein it is alleged that the state is the owner, in possession, and entitled to the possession, of the entire bed of the lake, including the unwatered strip, In an action to quiet title, the plaintiff may allege his title, ownership, and possession in general terms, and thereunder may prove whatever title he has. The demurrer therefore admitted such general allegations, unless the plaintiff, by other or specific averments, destroyed or materially impaired them. If a plaintiff, after alleging title in general terms, attempts to set out the facts or source of his title by specific averments, ordinarily the latter may be regarded as controlling the former, especially if the latter are inconsistent with the former. The only particulars in which the state has attempted to specify its title, or, rather, its source of title, are the allegations that it, in its sovereign capacity, upon its admission into the Union, became the owner in fee, and entitled to the possession of all lands underlying navigable waters within the state. Such allegations of source of title, being rather a statement of a legal conclusion, would not be admitted by a general demurrer, if the conclusion, as matter of law, were erroneous. But this court will judicially know what the law is in that respect. And what is judicially known may not be controverted by pleadings, or made issuable by them. We judicially know that, when Utah was admitted into the Union, title in fee to all lands underlying navigable waters within the state vested in the state in its sovereign capacity, and that such lands may be disposed of as it may elect, subject only to the paramount power of Congress to control such waters for purpose of navigation in commerce among the states and with foreign nations, a factor or element not here present. That is well settled. *United States* v. *Holt State Bank,*

270 U. S. 49, 46 S. Ct. 197, 70 L. Ed. 465; *Commonwealth of Massachusetts* v. *State of New York*, 271 U. S. 65, 46 S. Ct. 357, 70 L. Ed. 838; *Oklahoma* v. *Texas*, 258 U. S. 574, 42 S. Ct. 406, 66 L. Ed. 771; *Brewer-Elliott Oil & Gas Co.* v. *United States*, 260 U. S. 77, 43 S. Ct. 60, 67 L. Ed. 140; *Shibely* v. *Bowlby*, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331; *Knight* v. *United States Land Ass'n*, 142 U. S. 161, 12 S. Ct. 258, 35 L. Ed. 974; *Hardin* v. *Jordan*, 140 U. S. 371, 11 S. Ct. 808, 838, 35 L. Ed. 428; *Packer* v. *Bird*, 137 U. S. 661, 11 S. Ct. 210, 34 L. Ed. 819; *Barney* v. *Keokuk*, 94 U. S. 324, 24 L. Ed. 224; *Escanaba & L. M. Tansp. Co.* v. *Chicago*, 107 U. S. 678, 2 S. Ct. 185, 27 L. Ed. 442; *Northern Pac. R. Co.* v. *Hirzel*, 29 Idaho 438, 161 P. 854. As shown by the authorities, such title is not acquired by any express grant of Congress, but by operation of law as an incident to the sovereignty of the state. The proposition is not disputed. In his brief the respondent admits that "title to the beds of navigable waters became lodged in the state on its admission into the Union." And in the brief of amici curiae, more properly called amici rei, it is stated:

"Utah Lake is navigable. The complaint so alleged and the general demurrer admits it. The title to the bed vested in the state of Utah at statehood. It is so alleged in the complaint, admitted in the demurrer, and conceded by the respondent."

Thus the general allegations in the complaint as to the state's title and ownership are in no particular impaired, but strengthened, by the further allegations as to the state's source of title. If the defendant, willing to admit that the state on its admission into the Union was vested with title and ownership of the bed of the lake, but desires to traverse the state's present title, ownership or right of possession, or to claim that the state, since statehood, in some manner has parted with, or become divested of, title, or that the defendant since acquired a right or title superior to that now claimed by the state, he is re-

quired to show that by answer or counterclaim. It of course is not claimed that the general demurrer could serve any such purpose.

If we correctly understand the brief and argument of the respondent and of his friends, it in effect is claimed that, notwithstanding the general allegations of present title and ownership in the state, sufficient other allegations are therein made to show that the defendant, as a riparian owner, and not the state, has title to the bed to the center of the lake, including the strip. This, as we understand, is based on the allegations of the complaint that, when the patent from the government was issued to the defendant's predecessor in interest, the lands described in the patent were riparian lands, located along, and contiguous to, the then existing water's edge of the lake, from which it is argued that, though the title to the bed of the lake vested in Utah on its admission into the Union, nevertheless the defendant and his predecessor in interest, as riparian owners, under the laws of this state, acquired title to the bed of the lake to its center.

It, however, is not claimed that the defendant or his predecessor in interest acquired any such title or right by virtue of the patent issued by the government in 1879. To the contrary, the respondent, in his brief, states that "the United States patent to his predecessor in interest conveyed of its own force no title below high-water mark at the time of statehood," and that "title to the beds of all navigable waters became lodged in the state at its admission into the Union." Nor is any different position taken by amici rei. And the law seems to be well settled that "grants by Congress of portions of the public lands within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, and do not impair the title and dominion of the future state when created; but leave the question of the use of the shores by

the owners of uplands to the sovereign control of each state, subject only to the rights vested by the Constitution of the United States." *Shively* v. *Bowlby,* supra.

In an early day, in *St. Paul & P. R. Co.* v. *Shurmeier,* 7 Wall. 272, 19 L. Ed. 74, it was said that the bed of a navigable stream is not conveyed by a patent of the United States of lands adjoining it. And, inasmuch as it is not disputed, but is conceded, and, as has often been declared by the Supreme Court of the United States, that title to lands under navigable waters are held by the United States for the benefit of the whole people, and in trust for future states, and that grants by the government of uplands contiguous to, or bordering on, navigable waters in no sense convey or grant any right, title, or interest in or to lands lying under such navigable waters, but that the title thereto in fee vests in the state on its admission into the Union, and that all such belong to the state, and are subject to such regulation, disposition, and control as the state may elect, further citation of authorities or further consideration of the subject in such particular becomes unnecessary.

Hence we come to the proposition, and as was stated in *Hardin* v. *Jordan,* supra, of whether the right or title of riparian owners of lands bordering on navigable waters, under the laws of the state, extends to the center of the lake or stream, or whether it stops at the water's edge. That is the chief point which divides the parties here, the respondent asserting that his title to, and right of possession of, the bed under the laws of this state extend to the center of the lake. In such particular his claim made is this: That in 1898, two years after statehood, the state, by legislative enactment (section 2488, R. S. 1898), provided that:

"The common law of England, so far as it is not repugnant to, or in conflict with the Constitution and laws of the United States, or the Constitution and laws of this state, shall be the rule of decision in all the courts of this state."

Such statute continued to be, and is now, in force and effect. Comp. Laws Utah 1917, § 5838. Thereunder the respondent contends that the common law of England as to riparian owners is now, and since 1898 was, in full force and effect in this state, and that by reason thereof the respondent had title to the bed of the lake to its center. Under the common law of England the ownership of the bed of a stream did not depend upon the navigability of it but upon the presence or absence of tides. Thus the king or crown became the owner of the bed of all tidal waters, the bed of the sea, and the beds of all rivers or other bodies of water to the extent that they to high-water mark were affected by the ebb and flow of the tide; that riparian owners of lands bordering on rivers or streams affected by tides were the owners of the beds above high-water mark and of the beds of all fresh bodies of water whether navigable in fact or not; and that such riparian owners owned the bed to the center or thread of the river or stream. Utah Lake is an inland body of fresh water about 30 miles in length, and about 12 miles in width, lying wholly within the state, and, of course, is not affected by tides. Thus, under the English common law, the defendant asserts title to the bed of the lake to its center, regardless of the admitted fact that the lake is a navigable body of water.

On the other hand, it is the contention of the state that, by section 2488, R. S. 1898, this state adopted the common law of England only to the extent that such law or doctrine is suitable or adaptable to our conditions, and that it had not otherwise adopted or applied the common law of England to any other or further extent; that the English common-law doctrine of riparian owners never obtained in this state, nor in any other Western State; that it is repugnant to the statute law of this and other Western States relating to irrigation and water rights; that such doctrine is wholly unsuitable and inadaptable to the system or plan of appropriation and use of waters for purposes of irrigation and

for other beneficial and useful purposes; that the character, extent, and conditions of bodies of fresh water, rivers, and lakes on this continent and in the United States, and the custom and usages with respect to them, are so vastly different from, and dissimilar to, those of the British Isle, as to render the common-law doctrine of England wholly unsuitable and inapplicable to navigable waters of our country; that thus the common law of England as to riparian owners never did prevail in the Western States of this country, nor, with few exceptions, elsewhere in the United States; and, to the contrary, as has been seen, beds of all of such waters—navigable waters—were held by the United States in trust for the benefit of the whole people, and were not conveyed by grants of the government of lands bordering on such waters, and that the title thereto in fee vested in the states on their admission into the Union.

In an early day, the Supreme Court of the United States, in *Van Ness* v. *Pacard*, 2 Pet. 137, 7 L. Ed. 374, said:

"The common law of England is not to be taken, in all respects, to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them, and adopted, only that portion which was applicable to their situation."

In *Hatch* v. *Hatch*, 46 Utah 116, 148 P. 1096, this court said that such was "familiar doctrine. How often has it been applied in this western country to riparian rights; elsewhere to descent where the civil and not the English common law was followed; to ancient lights and property rights of a feme covert, where partly the English common law and partly the civil law was followed. The old English common law was universally rejected in this country, wherever and whenever it was regarded as being repugnant to the spirit of our laws, and when not in conformity with the general policy of our government and institutions."

Before the days of steam or other motive power, boats and crafts of England could be operated only on waters

on the British Isle in which the tide ebbed and flowed. Thus navigability there depended upon the ebb and flow of the tide. Thus the king or crown held title to the beds of all waters affected by tides and riparian owners to the beds not so affected above high tide. But such test of navigability, and as frequently declared by the courts of this country, is wholly inapplicable to navigable lakes and rivers in this country, and is unsuited to our conditions. That the test of navigability in this country is not dependent upon the ebb and flow of tides, but upon navigability in fact, has so often been declared by the Supreme Court of the United States and other courts of our country, and is so well settled and recognized that authorities need not be cited in support thereof, other than the cases heretofore cited and especially *Escanaba & L. M. Transp. Co.* v. *Chicago*, supra, where it is said that the common-law test as to navigability, depending upon the ebb and flow of the tide, has long since been discarded in this country.

In *Stowell* v. *Johnson*, 7 Utah 215, 26 P. 290, our Territorial Supreme Court declared that:

"Riparian rights have never been recognized in this territory, or in any state or territory where irrigation is necessary; for the appropriation of water for the purpose of irrigation is entirely and unavoidably in conflict with the common law doctrine of riparian proprietorship."

In 1 Kinney on Irrigation and Water Rights, § 331, the author says:

"In the following states the common law of riparian rights is rejected in toto: Arizona, Colorado, Idaho, New Mexico, Nevada, Utah, and Wyoming. As the ownership of the beds of fresh water streams navigable in fact is one of the riparian rights, it follows that this right was also rejected and the ownership of the beds of these streams is in the states under whose jurisdiction these waters flow."

In view of this, it is difficult to perceive that the Legislature, by the enactment of section 2488, R. S. 1898, there-

by intended, among other things, to establish and adopt in this state the English common-law doctrine as to riparian owners; and, it being conceded, as it is, and the law settled, as it is beyond all controversy, that the government grant of the land to the respondent's predecessor, though bordering on navigable waters, conveyed no right or title to the bed below high-water mark, and did not impair the title or dominion of the future state when created (Shively 1. Bowlby, supra), and that, on Utah's admission into the Union, all lands underlying navigable waters within the state vested and belonged to the state in its sovereign capacity (*United States* v. *Holt State Bank,* supra), it again is difficult to perceive that the Legislature of Utah, by section 2488, R. S. 1898, thereby intended to divest itself of such title and vest it in riparian owners bordering on navigable waters.

Nevada, Idaho, California, and other states have statutes similar to, and corresponding with, section 2488, R. S. 1898, of our statute. In considering such statute, the Idaho Supreme Court, in *Northern Pac. R. Co.* v. *Hirzel,* supra, after referring to, and quoting, the Idaho statute identical with our statute under consideration, said:

"By the adoption of that section this state did not adopt the common law of England when such common law was inapplicable to the conditions of the state. The territory and state of Idaho, following the lead of other states having similar statutory provisions, only adopted such provisions of the common law as were applicable to the conditions of the state. The English doctrine of riparian rights has been repeatedly held not applicable to this country, especially as to navigable, nontidal rivers and lakes, since such rivers and lakes did not exist in England."

In *Calahan* v. *Price,* 26 Idaho 745, 146 P. 732, the Idaho Court, overruling *Johnson* v. *Johnson,* 14 Idaho 561, 95 P. 499, 24 L. R. A. (N. S.) 1240, and other cases based thereon, further stated:

"It is therefore, we think, the settled law of this state that no title to islands, lakes, or the bed of navigable streams passes to the pat-

entees of the United States by the sale of border lots, and that the state holds the title to the beds of navigable lakes and streams below the natural high-water mark for the use and benefit of the whole people, and that the right, title, or interest of riparian proprietors or owners of uplands to such shores are determined by the laws of the state, subject only to the rights vested by the Constitution in the United States."

In considering such a statute as ours, the Nevada court, in the case of *Reno Smelting, Milling & Reduction Works* v. *Stevenson,* 20 Nev. 269, 21 P. 317, 4 L. R. A. 60, 19 Am. St. Rep. 364, states that the common-law doctrine of riparian rights was unsuited to the conditions of their state, and, after setting forth and referring to their statute, identical with section 2488, R. S. 1898, of our statute, further said that:

"The statute is silent upon the subject of the applicability of the common law, but we think the term 'common law of England' was employed in the sense in which it is generally understood in this country, and that the intention of the Legislature was to adopt only so much of it as was applicable to our condition. An examination of the authorities will render this aparent."

The same rule was recognized as settled law in California in the sase of *Packer* v. *Bird,* supra; the courts of that state having a statute similar to ours holding that title to the beds of navigable waters located in the state belonged to the state and not to riparian owners.

The same result was reached in Kansas, *Dana* v. *Hurst,* 86 Kan. 947, 122 P. 1041, where, too, it was held that title to the beds of its navigable waters was in the state, and not in the riparian owners, so in Iowa, *Barney* v. *Keokuk,* supra; so in Oklahoma, *Oklahoma* v. *Texas,* supra; so in Oregon, *State* v. *Portland General Electric Co.,* 52 Or. 502, 95 P. 722, 98 P. 160; and in Washington, *Mann* v. *Tacoma Land Co.,* 153 U. S. 273, 14 S. Ct. 820, 38 L. Ed. 714.

Further as to this, and as bearing on the question of whether the state, by any legislative enactment or otherwise,

intended to, or did, divest itself of title to the beds of navigable waters: By the enabling act approved 1894, Utah in 1896, was admitted into the Union on an equal footing with the original states. By section 1, art. 20, of the Utah Constitution, it is provided:

"All lands of the state that have been, or may hereafter be granted to the state by Congress, and all lands acquired by gift, grant or devise, from any person or corporation, or that may otherwise be acquired, are hereby accepted, and declared to be the public lands of the state; and shall be held in trust for the people, to be disposed of as may be provided by law, for the respective purposes for which they have been or may be granted, donated, devised or otherwise acquired."

Thereunder beds of navigable waters are included as "public lands of the state," as "otherwise acquired." *Northern Pac. R. Co.* v. *Hirzel,* supra.

By section 2325, R. S. 1898, at the same session when section 2488 was adopted, the Legislature of Utah provided for a board of land commissioners to direct, manage, and control "all lands heretofore or which may hereafter be granted to this state by the government, or otherwise, for any purpose whatever, except lands used or set apart for public purposes or occupied by public buildings, and shall have the power to sell or lease the same for the best interests of the state and in accordance with the provisions of this chapter and the Constitution of the state." In 1911, Laws Utah 1911, p. 65, § 2325, was amended, still giving the board direction, management, and control "of all lands heretofore, or which may hereafter be granted to this state, by the United States government, or otherwise, and to lands lying below the water's edge on any lake or stream to the bed of which the state is entitled, for any and all purposes whatever, except lands used or set apart for public purposes or occupied by public buildings, and shall have the power to sell or lease the same for the best interests of the state and in accordance with the provisions of this chapter and the Constitution of the state; provided, that lands belonging to the state, lying below the water's edge of any lake or

stream shall not be sold." In 1917 (Laws Utah 1917, p. 387), the section was further amended permitting the sale of the bed of a lake or bay, which riparian owners may desire to purchase, at not less than $2.50 per acre. In 1919 (Laws Utah 1919, p. 302), in 1921 (Laws Utah 1921, p. 317), and in 1925 (Laws Utah 1925, p. 51), further amendments and provisions were made respecting sales and leasing of lands of the state, including lands underlying navigable waters, but, in case of sale of any portion of the bed of any lake or stream, the state reserved all mineral rights therein. Then in 1927 (Laws Utah 1927, p. 8), the Legislature in express terms reasserted the state's title to the beds of all navigable waters. It thereby was provided:

"Sec. 2. That the title to the beds of said rivers [Colorado and Green Rivers] and of each of them, as well as the title to the beds of all other streams and lakes which at the time of said admission of Utah into the Union were navigable in fact, vested in the state of Utah at the time of its said admission into the Union and said title has at all times thereafter been and now is vested in the State of Utah, except such portion or portions thereof as may have been heretofore disposed of by the State of Utah pursuant to law, by express grant."

This legislation, notwithstanding section 2488, R. S. 1898, clearly indicates a legislative intent and policy wholly inconsistent with the English common-law doctrine of riparian owners owning or acquiring any right, title, or interest in or to beds of navigable waters of this state. It thus is clear that, by section 2488, R. S. 1898, the Legislature did not intend to adopt or establish in this state the English common-law doctrine as to riparian owners giving them any right, title, or interest in or to beds of navigable waters within the state; and that such common-law doctrine is repugnant, not only to our laws just referred to, but also to our laws relating to irrigation and water rights, and is wholly unsuitable and inadaptable to our conditions, and is destructive of the basic principles upon which our laws relating to irrigation and water rights are founded.

We are therefore of the opinion, and the ruling is, that the respondent did not, nor did his predecessor in interest, in virtue of the grant from the government, or of section 2488, R. S. 1898, or otherwise, as a riparian owner, acquire any right, title, or interest in or to the bed of the lake, but that the title thereto, including the strip, on Utah's admission into the Union, vested in the state in its sovereign capacity, and that the state did not by any legislative enactment divest itself of such title. Nor is there anything appearing on the face of the complaint that it did so by grant or otherwise.

This brings us to the further proposition argued in the briefs. While the respondent bases his claim of title to and right of possession of the strip of land lying between the present water's edge of the lake and the lands granted by the patent from the government, on the theory that he, as a riparian owner bordering on the lake, had title to the bed of the lake to its center, yet in his brief makes the further claim of title and right of possession to such strip on the doctrine or theory of accretion or reliction. To support that, he cites and relies on the cases of *Poynter* v. *Chipman*, 8 Utah 442, 32 P. 690; *Knudsen* v. *Omanson*, 10 Utah 124, 37 P. 250; and *Hinckley* v. *Peay*, 22 Utah 21, 60 P. 1012, the first two of which were decided before, and the last after, statehood. It, however, will be observed that in none of such cases was any ruling made or anything said to indicate that a riparian owner owned the bed of the lake to its center, or that he owned any farther than the water's edge of the lake.

In the Poynter Case the plaintiff, by a grant from the government to his predecessor of lands bordering on Utah Lake, claimed the right to, the possession of, lands between the water's edge of the lake and the meander line, and claimed the right to follow the water's edge of the lake. The defendant claimed the right to occupy such lands as a part of the public domain of the United States. The trial court charged the jury that the plaintiff was entitled to occupy the lands to the water's edge, whether he had absolute title

thereto or not. The plaintiff had judgment. On appeal, the Territorial Supreme Court, in affirming the judgment, said:

"We think the court made no mistake in charging the jury that if the plaintiff owned the land to the meander line along the old shore of the lake, by patent from the United States, he would be entitled to recover all the dry land made by recession of the water between such meander line and water's edge,"

—and, inasmuch as no damages were allowed plaintiff, it was held not material to consider the charge that the plaintiff could recover whether he owned the absolute title in fee or not.

But the court viewed the case from the standpoint that the government of the United States held lands under "tide waters," not navigable waters, in trust for the whole people, which could not be granted to individuals, and which vested in the state when organized and established. Then the court observed that, at common law, rights of a riparian proprietor bordering on a navigable stream extended only to high-water mark, but that at common law only arms of the sea and streams where the tide ebbed and flowed were deemed navigable. Then the court observed that there was "no tide water in this territory and therefore no water which, by the technical meaning of the term 'navigable' at common law, would come within it. The general rule of the common law is applicable to inland lakes which are not of such a size or importance as to be classed with the great navigable lakes of the country, and we do not consider that we should depart from that rule in this case. The fact that Utah Lake is navigated or navigable does not change the rule in this case."

But, as is seen, even the respondent does not now contend for such a doctrine. He concedes that, not only lands underlying "tide waters," but also lands underlying "navigable waters," in fact, are held by the United States in trust for the whole people, the title of which, in fee, vested in the

state on its admission into the Union. And, as has been seen, so are the authorities generally. Said the Supreme Court of the United States in *United States* v. *Holt State Bank,* supra:

"It is settled law in this country that lands underlying navigable waters within a state belong to the state in its sovereign capacity."

And the Supreme Court of the United States repeatedly declared that in this country waters are navigable, which in fact may be used for navigation, whether tide waters, or fresh bodies of water, rivers, and lakes, wholly unaffected by tides; and that the common-law test of navigability long ago was discarded. Hence we have here present a dominant and an essential factor not present in the Poynter Case—the factor that on Utah's admission into the Union absolute title in fee to all of the underlying waters of the lake below high water vested in the state. That is not disputed, and is conceded. And, since it is alleged and admitted that the lake is navigable, and is being, and may be, used for navigation in fact, the concession is compelled, for, as the respondent well admits, that is what the Supreme Court of the United States time and time again decided. *Knudsen* v. *Omanson,* supra, and *Hinckley* v. *Peay,* supra, but followed the Poynter Case.

Thus, and as the respondent again in effect concedes, that to prevail as against the state's vested title, it is essential to show that it, by some legislative enactment, which is claimed was done by section 2488, R. S. 1898, or by some grant which is not claimed, divested itself of title, or otherwise recognized title in riparian owners of lands bordering on the lake to the center of it, which as has been shown is not, but that the contrary is, the case. In this view the question of accretion or reliction of land is not material or here involved.

But further as to this: We have before us only the allegations of the complaint. As already seen, in the com-

plaint it is unqualifiedly alleged that the state is the owner in fee, in possession, and entitled to the possession, of the strip in question, argued in the brief of the respondent to be accreted lands. Such an allegation in an action to quiet title is a good declaration of ownership and right of possession. That title and right of possession as so alleged the defendant by his general demurrer, for purposes of the demurrer, admitted. It, however, in effect is argued that other provisions of the complaint are inconsistent with such general allegations of ownership and right of possession; the allegations that the government's grant to the defendant's predecessor was "riparian land located along and contiguous to the then existing water's edge of the lake," and that since statehood, by pumping operations by diverse corporations and persons, the level of the lake was lowered, causing a strip of dry land between the present water's edge of the lake and the land described in the government patent, which the defendant characterizes as accreted land, and as such belonged to him and not to the state. Should the inconsistency be assumed, yet it is but one of ambiguity and uncertainty in the complaint, a defect, which, to reach under our Code, required a special demurrer; and may not be reached by a general demurrer. And then all we know of the defendant's claim of title and right of possession is the complaint. Therein it is alleged, not that the defendant claims title to the uncovered land on the theory or doctrine of accretion or reliction—that is negatived—but on the theory that the defendant as a riparian owner on the lake claimed title and right of possession to all lands opposite the lands described in his patent and underlying the waters of the lake to the center thereof, including the unwatered strip caused by the alleged pumping operations. The defendant by his demurrer admitted such allegations to be true, and that his claim as so alleged was his claim of title and right of possession. Hence, in such view, the question again of accretion or reliction is not involved.

Further, the doctrine of accretion or reliction of lands, when applicable, generally is applied to a gradual and imperceptible recession of waters of a lake or stream occasioned by natural causes. Whether it is applicable to such an artificial cause as in the complaint alleged is another question, which, for the reasons heretofore stated, we find unnecessary now to decide.

From what is said it follows that the court below erred in sustaining the defendant's demurrer to the complaint. The judgment of the court below, therefore, is reversed, the cause remanded, with directions to reinstate it, to overrule the demurrer, and give the defendant leave to further plead, if he be so advised. Costs to appellant.

THURMAN, C. J., and CHERRY, HANSEN, and GIDEON, JJ., concur.