**FRANKLIN REAL ESTATE COMPANY, Plaintiff, v. HENDERSON et, Defendants.**

Common Pleas Court, Morgan County.

No. 7303.  Filed July 29, 1952.

Day, Cope, Ketterer, Raley & Wright, Canton, for The Franklin Real Estate Company, plaintiff.

Ernest E. Erb, Pros. Atty., Randall Metcalf, Fogle & Fogle, Marietta, for Board of County Commissioners of Washington County, Ohio, and County Auditor of Washington County, Ohio, and for the Board of Education of Wolf Creek Local School District.

Frank H. Cox, Pros. Atty., Mercer & Abel, Robert S. Christie, McConnelsville, for Board of County Commissioners and County Auditor of Morgan County, Ohio.

Robert S. Christie, Robert V. Benjamin, McConnelsville, for Board of Education of Center Local School District.

William M. Summers, Marietta, for Board of Education of Beverly Local School District.

## OPINION

By CROSSLAND, J:

### PRELIMINARY STATEMENT

Before discussing, considering and determining any of the issues and the questions involved herein the Court first expresses its appreciation and admiration of the excellent and outstanding presentation of law and evidence by the very able participating counsel. Especially noteworthy was the concomitant of excellence, the genuinely friendly and cordially respectful attentiveness and consideration by all opposing counsel to one another and to the Court.

It is with a sense of deep pride in our American institutions that this Court, in approaching its duty and responsibility, acclams to the world an exemplification in the trial of this case of the characteristic American competitive spirit in earnest and forceful devotion to duty, pursued in an attitude

and atmosphere of high personal regard and friendly solicitude.

To all counsel, the Court expresses its very personal thanks and appreciation for its own real pleasure which the task evoked.

## JURISDICTION

1. In his opinion in **Petitt v. Morton et al., 36 Oh Ap 348,** Cuyahoga County Court of Appeals, affirmed in **124 Oh St 241,** Judge Sherick, on **page 353,** took note of **Section 16, Article I, of the Bill of Rights of the Constitution of Ohio,** in these words:

"We take the broad view that upon the principle of justice there is no wrong without a remedy, unless it be inhibited by statute or well-defined public policy. **Section 16, Article I, of the Bill of Rights of the Constitution of Ohio,** expressly provides that all courts shall be open and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

2. Is it no injury done plaintiff in its land that each of two counties now carries its controverted property on their respective tax duplicates and that each demands and insists upon full payment to it alone of all taxes derivable therefrom?

3. Is there any valid and compelling reason why plaintiff, who contributes all the substance and value of litigation, shall not have remedy from its dilemma by due course of law?

4. And is there any compelling juridical deficiency which says that plaintiff shall not have justice administered to it without denial or delay?

5. The separate statutory proceedings available to plaintiff are not only not as suitable and satisfactory to its problem and purpose but are also of doubtful finality in determining the questions and issues resolvable by declaratory judgment, a remedial recourse contemplated and intended by the legislature of this state for this very type of uncertain perplexity, in its enactment of §§12102-1 to 12102-16 GC inclusive.

6. The efficacy of a declaratory judgment in this case is the fact that it is the alternative of at least three independent and wholly unrelated statutory proceedings for the separate determination of county boundary, tax appeal, and road problem, and with the local school district question not then assured of answer and itself thereafter possibly requiring and awaiting the outcome of an eventual declaratory judgment action.

7. Can it reasonably be supposed that the framers of our state constitution and laws, in their enlightened and progressive outlook upon justice, incentive, development, pro-

gress, happiness and prosperity, intended either to deny or delay the adjudication of a justiciable controversy penalizing and impeding the lawful operation of any person, the value of whose investment and enterprise is the subject matter of an entire litigation?

8. Without taking the time to review and restate, in writing, the reasons and references which the Court firmly believes fully supported its previous rulings with respect to all jurisdictional issues, the Court now merely reiterates and reasserts its previous view that the within action is properly brought, highly appropriate and legally tenable and that this Court is authorized and empowered by fundamental and statutory law to hear, consider and determine the issues and questions herein presented and that the courts of this and many other states have so held; and also that the county defendants of both counties entered their general appearance herein at the outset of this litigation.

A. THE QUESTION OF THE COUNTY LINE.

9. Plaintiff's petition prays for the judgment of this Court declaring what parts of the lands described therein are situated in Washington County and what parts thereof are situated in Morgan County and declaring the rights and duties of the various defendants with respect thereto.

10. Upon the pleadings and the evidence the lands in controversy are a part of Section Thirty-one (31), Township Six (6) and Range Ten (10) and a part of Section Thirty-two (32), Township Six (6) and Range Ten (10), each of the Zanesville Land District or Muskingum Allotment, said part of Section Thirty-one (31) being either 8.91 or 9.84 acres and said part of Section Thirty-two (32) being either 19.95 or 18.06 acres, the differences apparently being attributable to the different stages of the Muskingum River at the time of the Dusz and Dumond surveys, the irregularity of the shore line, and also possibly a question of the exact location of the section line. Nevertheless, this aggregate acreage of said parts of said sections, whether 28.86 or 27.9 acres, admittedly constitutes the land in dispute, the rest of the described real estate being located in Washington County and therefore clearly outside the necessary purview of any declaration by the Court.

11. The question itself arises by and from the creation of Morgan County, erected by act of the legislature of the state of Ohio, December 29, 1817, and by its act of December 28, 1818, effective March 1, 1819, organized as such. (Statement of Facts, par. 2)

12. The "north boundary of the donation tract," referred

to in §14425 GC, is the north boundary of a certain tract of 100,000 acres conveyed by Letters Patent by the President of the United States to the Ohio Company pursuant to resolution of Congress passed April 21, 1792 (Statement of Facts, par. 3), and is generally known and referred to in various deeds, maps, plats and other documents as "Ludlow's line" or "Ludlow's survey" (Statement of Facts, par. 6) and is the South boundary of Township 6 of Range 10 above referred to, and said Township 6 was surveyed for the United States by John Bever in 1798 (Statement of Facts, par. 6).

13. The records indicate that the disputed land consisted of a tract of 26:13 acres "situated on the South side of the Muskingum River and between said river and said Ludlow's line" (Statement of Facts, par. 9), and that between September 2, 1814, and December 1, 1824, successive transactions at the Zanesville Land Office led to issuance of the Patent therefore by the United States of America to Edward T. Hayward, December 1, 1824, plaintiff's original predecessor in title of the disputed area (Statement of Facts, par. 9 and 10); that said tract was entered in the first tax duplicate for Morgan County for the year 1820 in the name of John Scott, in whose name it was similarly listed in 1821 (Statement of Facts, par. 11), a purchaser on credit who assigned his certificate to one Isaac Ross whose own assignee was the said Edward T. Hayward (Statement of Facts, par. 9); that for the years 1824 to 1826 inclusive and 1829 to 1834 inclusive said lands were entered on the tax lists of Morgan County in the name of Edward T. Hayward; and that said acreage was found to be first entered on the tax duplicate of Washington County, for the purposes of taxation, from the year 1871 down to and including the year 1951 (Statement of Facts, par. 12).

14. Paragraph 2 of the Statement of Facts defines the boundaries of Morgan County as provided by said §14425 GC, 16 Ohio Laws 42-43, the pertinent part of which reads as follows:

"beginning at the southwest corner of township eight, range thirteen; thence east to the eastern bank of the Muskingum river; thence down said river with the meanders thereof to a point where it will first intersect the north boundary of the donation tract; thence east with said northern boundary line to the southeast corner of township five, range nine;"

15. The Court repeats its view expressed toward the end of the trial, as found on page 128 of reporter Ruth Johnston, that "it is considered that location of the north boundary of the donation tract is well established, if not virtually conceded, on both sides, as indicated in recent surveys of the two counties and exhibited by them."

16. The remaining question and only question remaining, as affecting the two counties of Morgan and Washington, with respect to the defendant commissioners and auditor of each, is whether the dividing county line is the river bend and "thence east with said northern boundary line," from the eastern end of the river bend, or whether it begins at the western end of the river bend and "thence east with said northern boundary line."

17. What did the legislature mean and intend and how is its meaning and intention determined?

18. The question presented is not one of locating the county line but of determining whether or not the legislature in its enactment of §14425 GC did so unambiguously or uncertainly, either not requiring or requiring extraneous evidence to demonstrate its intention in the meaning of the language of its enactment.

19. The Court considers that the law is well settled in Ohio and elsewhere that a county is the creature and political subdivision of the state, that the law of the state fixes and determines the geographical limits of a county, and that in Ohio this sovereign power of the state, once exercised, could not and can not be abridged or otherwise affected by any subsequent act except its own. Such is the history of county legislation in Ohio, pursuant to constitutional authority and limitation, and so held. (**C. W. & Z. R. R. Co., v. Commissioners Clinton County, 1 Oh St 90.**)

20. The principle of law above referred to was aptly stated by the Supreme Court of Alabama in the case of Russell v. C. N. Robinson & Co., 153 Ala. 327, 44. So. 1040-1:

"Counties are political subdivisions of the state, created for public convenience in the administration of government. Their territorial limits are fixed by the Legislature, and outside of constitutional provisions whatever of jurisdiction and powers they possess are derived from the same source. They have no power or authority to alter or change their territorial limits or boundary lines. This is a right reserved to the Legislature of the state, and to be exercised in the way prescribed in the Constitution."

21. In the later case of Elmore County v. Tallapoosa County, 222 Ala. 147, 131 So. 552, the Alabama Supreme Court said:

"If a boundary line of a county can be determined as a question of law, acquiescence in another line by contiguous counties is immaterial."

22. The 14th syllabus in the Arkansas case of Pruitt v. Sebastian County Coal & Mining Co., 222 S. W. 2nd 50, decided July 4, 1949, reads:

"A definite legislative determination of county boundary

could not be changed by any amount of recognition or acquiescence."

23. Looking now to said §14425 GC, the first course begins "at the southwest corner of township eight, range thirteen; thence east to the eastern bank of the Muskingum river;" There is no contention of any patent or latent ambiguity as to the meaning of this language, which plainly and obviously was intended to take the line of the newly created county of Morgan to a point on the eastern bank of said river, east from the southwest corner of said township eight, range thirteen.

24. The language of the statute then continues: "thence down said river with the meanders thereof to a point where it will first intersect the north boundary of the donation tract;"

25. While the sitting Judge of this court has not been either a civil engineer or an English professor and while the Court holds both professions in the highest respect in their respective fields, it does not consider that the services of either profession or the testimony of any professional or other witness is at all necessary in order to understand clearly the meaning and intention of the foregoing language, nor even the interpretation of a court, in that the language simply means what it so plainly and unequivocally says, namely, that the boundary line of Morgan County proceeds down the Muskingum river with its meanders to a point where **it, the Muskingum river,** will **first** intersect **the north boundary of the donation tract,** or, in other words, where it first intersects the Ludlow line.

26. "thence east with said northern boundary line to the southeast corner of township five, range nine;" could only be from the FIRST and not a second or subsequent intersecting of the Ludlow line by the Muskingum river, the pronoun "it" obviously referring to the noun "river," the language within the semi-colons being a self-contained statement of intention with respect to that particular course, which is a course separate and distinct from the one previously stated, just as it is also separate and distinct from the one that follows, and in the same manner that each of the three are separate courses separately stated. The separate courses then hinge together just as do the separate statements thereof.

27. This Court further considers that the intention of the legislature, as revealed in and by the meaning of its boundary recitals, requires no interpretation whatever and that an ordinary grasp of the meaning and use of the English language, which the Court professes to have, without profes-

sorial or engineering aid or advise, is altogether adequate to apprise the Court clearly and fully exactly what the legislature intended and did.

28. The effect of the first course proceeding to the eastern or opposite bank of the river would be, of course, to place the full width of the river at that point of crossing in Morgan County and that is all and as much as can be ascribed to the delineation of the first course of the boundary line of Morgan County.

29. The Court unqualifiedly rejects, as tortured, distorted, unreasonable and unintended, the ungrammatical, unnatural and illogical interpretation sought to be placed on such plain and unambiguous language by the adherents and witnesses of Washington County.

30. As a matter of law, the Court holds that no testimony or other explanatory evidence is needed to understand the meaning intended in and by the language of §14425 GC and none is accepted or acted upon for such purpose.

31. Extraneous evidence, being deemed unnecessary, is immaterial and irrelevant, without probative or other evidentiary value, and is dismissed accordingly, with determination of the question of the Morgan County line being concluded by the inclusion within Center Township of Morgan County, as an original part of it, of the portion of plaintiff's lands described as follows:

### FIRST TRACT

Situated in the Township of Center, County of Morgan and State of Ohio, and being a part of Section Thirty-one (31), Township Six (6) and Range Ten (10) of the Zanesville Land District, and bounded as follows:

Beginning at the Southeast corner of said Section 31, which point is on the Ludlow line; thence North 84 deg. 56 min. West along said Ludlow line 1215.00 feet to the Muskingum River; thence down said river and following the meanders thereof in a Northeasterly direction a distance of about 1365 feet to the East line of said Section 31; thence South 5 deg. 04 min. West along the East line of said Section to the place of beginning, containing 8.91 acres.

### SECOND TRACT

Situated in the Township of Center, County of Morgan and State of Ohio, and being a part of Section Thirty-two (320, Township Six (6) and Range Ten (10), of the Zanesville Land District, and bounded and described as follows:

Beginning at the Southwest corner of Section 32, which point is on the Ludlow line; thence North 5 deg. 04 min. East along the West line of Section 32, 593.00 feet to the Muskingum River; thence down said river and following the meanders

thereof in a Northeasterly and Southeasterly direction to the South line of said Section 32, which said line is also the Ludlow line; thence along said Ludlow line North 84 deg. 56 min. West 1635.00 feet to the place of beginning, containing 19.95 acres.

32. Accordingly, it is considered and determined that said tracts should be described as situated in Morgan County, deeds for the conveyance thereof should be filed for record in Morgan County and taxes charged against the above described lands paid to Morgan County, and that there are no rights or duties of the Commissioners and Auditor of Washington County with respect to said lands, the rights and duties provided and imposed by law upon commissioners and auditor with respect to the lands within the county of their jurisdiction being in this instance the rights and duties of such officers of Morgan County.

33. In compliance with the motion that the Court state separately in writing its findings of fact and conclusions of law, rather than to repeat or restate preceding statements reference will merely be made by paragraph numbers for the purpose of identification and embodiment in journal entry, as follows:

Findings of fact, paragraphs 5, 6, 10, 11, 12, 13, 14, 15 and 16.

Conclusions of law, paragraphs 8, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 and 32.

34. Complying with said motion's request to make specific answer to questions 2 to 13 inclusive, the Court does so in their order, as follows:

2. Yes.

3. Yes.

4. Yes.

5-1. Washington County purported to exercise jurisdiction from 1871.

5-2. Morgan County defaulted but did not acquiesce.

6. The deliberations and considerations of the legislature in 1817 are concluded in and by its enactment of §14425 GC. The Court is not called upon to theorize or speculate and there is no occasion to consider doing either.

7. This question is disposed of by the Court's paragraphs 25, 26, 27, 28, 29 and 30.

8. No. Taxes were collected by Washington County officials, who merely acted in the vacuum created by the default and inaction of Morgan County officials.

9. There was no actual acquiescence on the part of Morgan County and none is implied.

10. No, as legally impossible.

11. None.

12. There was no such recognition by the counties and no finding thereof is made from any testimony.

13. a. The Court fails to find that Morgan County officials did or could at any time drop the disputed lands from Morgan County.

b. Answered in No. 5-1.

c. Answered in No. 5-2.

d. Neither relevant nor material, nor in evidence for reasons which accompanied trial rulings.

e. Answered in No. 7.

Each of the twelve specific questions and the foregoing answers thereto shall likewise be made part of the journal entry.

Exceptions granted Washington County defendants.

B. THE QUESTION OF THE LOCAL SCHOOL DISTRICTS.

Before approaching consideration of the legal aspects of the claims of the three local school districts the undersigned judge, as a citizen and neighboring resident free-holder of the Muskingum Valley, is impelled and constrained to inquire further of said parties and their respective counsel concerning present prospect of local school district consolidation.

In directing this inquiry it is with full understanding and appreciation of the fact that response thereto lies entirely within the province of the disposition and inclination of each such school district. It is not the purpose or desire of the undersigned to seek to impose an unwanted suggestion upon any unwilling party, much less to invade the prerogative of local school district consideration and determination. It is simply that the undersigned cannot dispel in his own mind certain equitable considerations of several and joint interest and concern of each of the three involved local school districts.

By way of explanation only, various transfers of territory from Center Local School District in Morgan County to Beverly Local School District in Washington County are indicative recognition of inability on the part of said Center District alone to serve adequately the school attendance needs of a portion of its Morgan County youth, while the inter-relationship thereby occasioned refutes any proposition that said Beverly District is a self-contained unit within Washington County, and while the Wolf Creek Local School District, although entirely outside Morgan County, geographically and physically is the most intimately contiguous of the three. However, the salient fact of superior and transcending significance is that not one of these three districts ever contributed anything to the disputed territory, although each is now seeking to benefit therefrom alone. It should be added that no

criticism is intended or implied for the past, as there has been no occasion for any schooling or other school service for the disputed area.

The local economic by-product of the Ohio Power Company's future generating plant is indivisible by or along local school district lines but the continued existence of such lines is bound to retard or limit its potential throughout the combined territory of said three districts and may exclude it almost entirely from the ones deprived of said plant's school revenues, in addition to the direct loss for school purposes.

Beyond the direct and indirect tangible benefits, educationally and economically, within the natural and normal aspiration of present and prospective inhabitants of the entire community, neighboring families and neighborhood children, are the variable factors of social life in an average rural community, that are conducive either to harmony, friendliness and good-will or to dissension, hostility and ill-will. We citizens cannot help create harmony and happiness in our beloved country, now so desperately needed for effective national participation in our presently unsettled and uncertain international relationships, unless we strive earnestly and consistently to do so within our local communities and we cannot do so locally if we withhold from others among and about us advantages that exceed our own needs, particularly when such advantages are not the fruit of our own industry, effort, or design.

"There is that scattereth, and yet increaseth; and there is that withholdeth more than is meet, but it tendeth to poverty."
(Proverbs: Chapter 11, Verse 24)

"He that is first in his own cause seemeth just; but his neighbor cometh and searcheth him."
(Proverbs: Chapter 18, Verse 17)

It is with a sense of profound respect for the legal question submitted, without desire or disposition to become argumentative or evasive of the issues, but solely to relate the misgiving that being required to make judicial pronouncement thereon entails, that prompts this most unusual request for up to the minute information of the latent possibilities for common cause in behalf of the similar aims of the constituents of the three local school districts, through their official boards, pursuant to the enabling provisions of law.

In order to afford opportunity for full consideration by the three involved local school districts of their common interest and concern no journal entry in the case will be expected or required until this latter matter has been administratively or judicially determined.

## SUPPLEMENTAL OPINION
Filed September 10, 1952.

By CROSSLAND, J;—

THE QUESTION OF THE LOCAL SCHOOL DISTRICTS

The Court having been informed by letter of August 28, 1952, pursuant to its Inquiry of July 29, 1952, relative to the above stated question, that:

"Counsel agree that there appears to be no possibility of consolidation or integration administratively of the three school districts at the present time,"

the duty thereby devolves upon the Court to consider and determine the legal issues herein engaged and therefore proceeds to do so.

Supplementing the Court's findings of fact and conclusions of law requested by the Washington County and Wolf Creek Local School District officials, as heretofore given, the court further considers and determines that its said findings and conclusions of July 29, 1952, clearly remove Wolf Creek Local School District as possible claimant of the disputed territory, inasmuch as said school district makes and has no claim whatever to any Morgan County Territory, said formerly disputed territory having been determined heretofore to be a part of Center Township in Morgan County.

The sole remaining issue concerns the respective claims of the two remaining school districts, Beverly Local of Washington County and Center Local of Morgan County.

Both latter school districts are legally created and operating public school administrative units, having their inception, continuity, government and administrative history and presently constituted existence under and pursuant to state law and proceedings of their local and respective county school boards.

Under authority of law and pursuant to provisions thereof numerous transfers of territory were made from Center Local to Beverly Local, beginning shortly after the creation originally of the Beverly Village School District, January 3, 1930.

The first official action taken with respect to a subsequent series of transfers was by the Morgan County Board of Education, at a special meeting of September 1, 1930, concerning which Exhibit B-26 was offered in evidence, objection to which was heretofore sustained but which the Court now considers should have been admitted in evidence and therefore recalls its said former ruling and now overrules said objection thereto.

It will be noted that former §4685 GC, effective during the time and at the occasion of pertinent transfers, similar in effect to existing §4830-5 GC, provided as follows:

"Territory **must** be contiguous.—The territory included with-

in the boundaries of a city, village or rural school district **shall** be contiguous except where an island or islands form an integral part of the district." (Emphasis by the court.)

Whatever the legal effect of the September, 1930, and August, 1932, transfers of territory for school purposes from the Morgan to the Washington County School District, in each instance such territory was recognized and characterized by the Morgan County Board of Education as "contiguous to said Washington County School District," and in each such instance the territory formerly in Center Township Rural School District was thereby "attached to and made a part of Beverly Village School District in Washington County, Ohio."

The Morgan and Washington County Boards of Education are presumed to have proceeded and acted in contemplation and fulfillment of law, in exercising jurisdictional authority over the subject matter of territory transferred for school purposes and without challenge of its purported validity either then or since, appear to have done so and it is so considered and determined by the Court.

What then is the legal effect of these particular transfers?

A natural beginning of the answer to the foregoing question lies in a further question. What was the legal effect **after** such particular transfers? Must it not likewise have been intended on the part of the Morgan County Board of Education that the territory thereafter remaining in the former Center Township Rural School District "shall be contiguous," in compliance with the explicit mandatory provision of §4685 GC and its introductory mandate that such "Territory must be contiguous"?

The Court certainly considers that these two respective county boards of education each actually knew, just as they are also presumed to have known, the provisions, meaning, purpose and legislative intent expressed and implicit in the statute under and pursuant to which the Morgan County Board of Education transferred and the Washington County Board of Education accepted certain territories out of Center Township Rural School District of Center Township, Morgan County and into Beverly Village School District of Washington County.

The only logically and legally possible inference deducible therefrom is that the then duly constituted and acting Morgan County Board of Education intended and expected that there were transferred by them in these September, 1930, and August, 1932, transfers of territory from Center Township in Morgan County for school purposes and thereupon for such purposes subsequently "attached to and made a part of

Beverly Village School District in Washington, County, Ohio," all territory of Center Township Rural School District lying south of the intended and expected north boundary line of the said Beverly district. Nor could said Morgan County Board then have legally and properly acted and done otherwise than as is now necessarily inferred as its intention and purpose at that time in contemplation of and obedience to law.

Moreover, the action of the Morgan County Board of Education, at its special meeting of September 1, 1930, as a sort of preamble to its formal transfer of September 18, 1930, clearly expresses the intention consummated by its said subsequent action, in determining in said special meeting that "it was shown that the terrtory involved in the proposed transfer included all of—fractional section 31 and parts of fractional section 32," then excluding from the latter only such part of fractional section 32 as was subsequently transferred in the August, 1932, transfer. (Emphasis by the court.)

Certainly, the foregoing clearly and definitely evidenced a desire and purpose of the Morgan County Board of Education to divest itself of all territory in fractional sections 31 and 32 and in so doing it thereby, and only thereby, complied with the mandate of law under which it acted and operated.

The Court therefore concludes that the disputed territory comprised in that part of plaintiff's lands lying within the bounds of the Muskingum River and the north boundary of the donation tract, as described and referred to in its Opinion of July 29, 1952, is and has been since November 7, 1930 a part of the present Beverly Local School District and so declares its judgment with respect to the contentions of the aforesaid three local districts, with the rights and duties appropriate thereto on the part of the respective counties and county and school board officials of Morgan and Washington as well as of the Board of Education of the Beverly Local School District.

Formal findings of fact and conclusions of law consistent and in accordance with the foregoing paragraphs of this Opinion may be prepared and submitted by counsel for said Beverly District to plaintiff and Morgan County Counsel for inclusion and integration in a single Journal Entry pursuant to this and the opinion of July 29, 1952, and upon its final completion by all of them then submitted to remaining counsel for their approval and then to the Court for its consideration and approval for filing by the Court, noting and saving exceptions to all adverse parties, with costs taxed to plaintiff.