Ronald L. BAXTER and Shirley Diane
Baxter, Plaintiffs and Appellants,

v.

UTAH DEPARTMENT OF TRANSPOR-
TATION, Defendant, Third–Party
Plaintiff, and Respondent,

v.

Robert Rees DANSIE; Marie Grow Dan-
sie; Davis County Assessor; Davis
County Commissioners; Davis County
Recorder; and Weber County, Third–
Party Defendants.

No. 890175–CA.

Court of Appeals of Utah.

Nov. 9, 1989.

Rehearing Denied Dec. 20, 1989.

Glen E. Fuller, Salt Lake City, for plaintiffs and appellants.

R. Paul Van Dam and Stephen C. Ward, Salt Lake City, for respondent Utah Dept. of Transp.

Gerald E. Hess, Farmington, for Davis County.

Brent E. Johns, Ogden, for Weber County.

Before BENCH, GREENWOOD and JACKSON, JJ.

## OPINION

JACKSON, Judge:

Ronald L. Baxter and Shirley Diane Baxter (the Baxters) appeal from a judgment quieting title to six acres of land in the Utah Department of Transportation (UDOT). We reverse.

This dispute arises out of the territorial General Assembly's use of the center of the channel of the Weber River as part of the southern border of Weber County and the northern border of Davis County, in combination with two facts. First, until at least 1886, the river moved through more than one channel in the vicinity of the property now claimed by the parties. Second, the channel of the Weber River now lies to the south of the disputed property, but did not follow its present course in years prior to 1894.

At the outset, we note that this is not an action between counties seeking a judicial declaration of where their common boundary lies on the ground at all points. Nor is this a lawsuit between riparian owners on either side of a boundary river in which each claims title to formerly submerged land that has surfaced because of a shift in the course of the river. This is a quiet title action to six acres of land in which defendant attacked plaintiffs' record title by challenging the title of plaintiffs' tax deed grantor, Davis County, based on an allegation that the property lies in Weber County. The issues presented on appeal are: (1) when and where was the boundary between Davis and Weber Counties fixed and established; (2) were the subject six acres north (i.e., in Weber County) or south (i.e., in Davis County) of that fixed boundary at that time; and, if south, (3) was the location of the boundary thereafter moved to the actual location of the Weber River in 1894 (i.e., to the south of the subject six acres, thereby placing the six acres in Weber County) either (a) by subsequent legislative enactment, (b) by county action authorized by the legislature, or (c) by the river's gradual and imperceptible movement there.

We begin our analysis of these issues with a full presentation of the history of this litigation and of the parties' competing claims to ownership. In March 1946, title to an 18–acre tract near the border separating Davis and Weber Counties was quieted in Tasma Dansie in a decree that contained a legal description of the tract and characterized it as lying in Davis County. The tract was conveyed by Tasma Dansie in March 1961 to Robert and Marie Dansie by way of a warranty deed containing the

following property description: "S ½ of N ½ of SW ¼ of Sec. 25, 5 N., 1 W. SLM, Cont. 18.00 Acres in Davis County." Tax sale proceedings were eventually initiated by Davis County because of unpaid 1964 property taxes.[1] Ronald Baxter and two others acquired the 18–acre tract as tenants-in-common under a tax deed from Davis County that was executed on May 26, 1969. The following year, the tenants-in-common evenly partitioned the tract by reciprocal quitclaim deeds, and the Baxters thereby acquired the six acres that are the subject of this litigation.

In the meantime, however, the Dansies had conveyed the original 18–acre tract and other property to UDOT's predecessor state agency by warranty deed prepared by the agency and executed on May 14, 1964. The 18–acre tract (from which the six acres at issue in this case came) was described in the deed under the heading "IN WEBER COUNTY." The other property conveyed to UDOT in the same warranty deed was described under the heading "ALSO IN DAVIS COUNTY."

After a 1978 judgment dismissing a damage action by Baxter's former cotenant for injury to his separate six-acre parcel, dis-cussed below, the Baxters filed this quiet title action in 1979, basing their claim to title on the 1969 tax deed from Davis County. UDOT filed an answer, attached its warranty deed from the Dansies, and asked the court to "rule that the property in question is located within the boundaries of Weber County" and to quiet title in its name. UDOT alleged that the tax deed from Davis County was void and asserted that the Baxters did not thereby acquire ownership of the property. As the basis for this claim, UDOT alleged that, because the property is located in Weber County, Davis County had no authority to tax the property, to acquire title when taxes were unpaid, or to convey title through a tax deed.[2] UDOT also pleaded collateral estoppel based on a 1978 judgment dismissing a damage action by Ronald Baxter's former cotenant, Toone, against the contractor UDOT permitted to remove gravel from the property adjoining the Baxters'.

In February 1983, the trial court granted UDOT summary judgment on the collateral estoppel defense. Because Toone was determined not to be the owner of the adjacent property in the 1978 judgment—based on a jury's determination that it lies within

---

**1.** At the time of the sale of the Dansies' property for unpaid taxes and the tax deed from Davis County, tax sale proceedings were governed by Utah Code Ann. §§ 59–10–26 to 59–10–65 (1974) (now see Utah Code Ann. § 59–2–1325 to 59–2–1364 (1987)). At that time, section 59–10–64(5) authorized the county auditor to execute a tax deed conveying fee simple title to the purchaser at a tax sale. Once executed and delivered by the auditor, the statute made tax deeds "prima facie evidence of all proceedings subsequent to the preliminary sale [to the county] and of the conveyance of the property to the grantee in fee simple." *Id.* (now see Utah Code Ann. § 59–2–1363(6) (1987)). The strength and stability of title acquired by tax deed are aided by this provision and by the four-year statute of limitations barring untimely affirmative actions or defenses that challenge tax titles, Utah Code Ann. §§ 78–12–5.1 and 78–12–5.2 (1987), which applies even if the tax title is invalid. Utah Code Ann. § 78–12–5.3 (1987); *Frederiksen v. LaFleur,* 632 P.2d 827 (Utah 1981).

**2.** As an alternative defense, UDOT also pleaded that the 1969 tax deed from Davis County was invalid because statutory tax sale procedures were not followed. In its brief, UDOT mentioned—without citing us to the record—that trial of its two defenses was "bifurcated" by the trial court, with the separate trial on the alleged tax *sale* invalidity to be heard only if UDOT failed to establish the tax *deed* invalidity at the first trial by proving its allegation that the six acres lie within the boundaries of Weber County. Our independent scrutiny of the record before us in this ten-year-old action has unearthed no oral or written motion for such a bifurcation, *see* Utah R.Civ.P. 7(b)(1), a request presumably governed by Utah R.Civ.P. 42(b), and no order of the court granting such a request. *See* Utah R.Civ.P. 7(b)(2). The issue of the validity of the tax sale proceedings that led to the 1969 tax deed was not raised by anyone at the pretrial hearing or explicitly preserved in a pretrial order in this case for later resolution. Indeed, there is no mention of this defense in the record before this court other than in UDOT's pleading. In light of these circumstances, UDOT must be deemed to have abandoned this alternative defense, and it is not entitled to another trial on this alternate theory if the judgment appealed from here, which is based on the purported location of the subject six acres within Weber County, cannot withstand appellate review.

the boundaries of Weber County [3]—the trial court concluded that Baxter could not relitigate that issue. On appeal, the Utah Supreme Court held that application of the collateral estoppel doctrine to the Baxters' quiet title action was erroneous. Summary judgment in UDOT's favor was reversed, and the case was remanded. *Baxter v. Utah Dep't of Transp.*, 705 P.2d 1167 (Utah 1985).

At the bench trial in August 1986, the Baxters contended that the location of the boundary line between the counties was set by the actual location of the Weber River's main channel at the time of the legislature's initial description of the boundary, which they believed was on January 10, 1866. At that time, they asserted, the Weber River was north of the subject six acres, putting them in Davis County. They claimed that the boundary's location has remained fixed in that spot since there is no subsequent indication of legislative intent to move it from there. Furthermore, they argued, the counties themselves had no authority to move their common boundary from the legislatively fixed location by thereafter agreeing to accept the surveyed location of the main channel of the river in 1894, to the south of the subject six acres, as their boundary.

UDOT, on the other hand, contended that there was "uncertainty" about where the Weber/Davis County boundary line was prior to 1894 because the river moved around before then and because the excerpted survey notes in evidence did not contain a metes and bounds description of the Weber River's location on the ground through Section 25 before 1894. This uncertainty was resolved, UDOT claimed, when the Weber and Davis County surveyors surveyed a line down the middle of the channel of the Weber River in 1894, when the river was concededly running to the

south of the property now claimed by the Baxters. Furthermore, because the counties adopted the 1894 surveyed location of the river as their common boundary line, that was the county boundary thereafter adopted by the state constitution. This action by the counties was authorized, UDOT argued, by the following territorial act, adopted February 20, 1878:

> Whenever any dispute or uncertainty shall arise as to any county boundary, the same may be determined by the county surveyors of the counties interested, and in case they fail to agree, or otherwise fail to establish the boundary, the county courts of either or both counties interested, may engage the service of the aforesaid Territorial Commissioner, who, with the said county surveyors, or either of them, if but one appear for that purpose, shall proceed forthwith to permanently determine such boundary line at the expense of the counties interested by making the necessary surveys and erecting suitable monuments to designate said boundaries, which shall be deemed permanent until superseded by legislative enactment. Nothing in this act shall be construed to give the surveyors, mentioned herein, any further authority than to erect suitable monuments to designate said boundaries as they are now established by law.

1888 Compiled Laws of Utah § 86 (now *see* Utah Code Ann. § 17-1-33 (1987)).

At the conclusion of trial, the court found that "the exact location of the Weber River in 1866 cannot be determined," apparently because the evidence contained no description of its course through Section 25 at that time along a surveyed line. Although the trial court agreed with the Baxters that the boundary had been legislatively established by the description given in

---

**3.** It was not until after this 1978 judgment, in *Toone v. LeGrande Johnson Constr. Co.*, Civ. No. 20915 (Second District Court, Davis County), that Davis County stopped assessing the six acres claimed by the Baxters and tendered them a rebate of some property taxes previously paid to it. At the *Toone* trial, the parties were apparently unaware of the 1866 statute setting forth the description of the county lines, discussed in

section I of this opinion, *infra*. They stipulated that the location of the Weber River upon statehood on January 4, 1896, marked the boundary between Davis and Weber Counties. The jurors were, therefore, asked to decide whether Toone's six acres were located in Weber County by reference to the river's actual location as of that date.

the 1866 enactment, it otherwise embraced UDOT's legal analysis. The court concluded that the counties had, in 1894, properly exercised the authority given them in section 86 of the 1888 Compiled Laws to resolve the boundary uncertainty and to fix their common boundary as the surveyed 1894 location of the center of the channel of the Weber River. Thus, according to the trial court, the subject six acres "is and has always been in Weber county," rendering the tax deed from Davis County invalid. Title to the six acres was accordingly quieted in UDOT, and this appeal ensued.

I.

■ We address first the question of the legislature's establishment of the boundary between Davis County and Weber County. The fixing of a county boundary is a legislative prerogative, *San Juan County v. Grand County*, 13 Utah 2d 242, 371 P.2d 855, 856 (1962), as is the prescription of a method for resolving any uncertainty about the actual location of that boundary on the ground. *Barton v. Sanpete County*, 49 Utah 188, 162 P. 611, 612 (1916).

The parties and the trial court proceeded on the incorrect belief that these counties, as well as their common boundary, were first established by the territorial legislature in 1866. Our research has revealed that Weber County, one of the first six counties of what is now Utah, was created in section 1 of a January 15, 1850, act of the territorial General Assembly. *Laws and Ordinances of the State of Deseret 1850–51* (originals on file at Church Historian's Office, Church of Jesus Christ of Latter–Day Saints, Salt Lake City, Utah) (text copied from originals and printed in 8 Utah Historical Q. 180 (1940)). Davis County was not created until an act of October 5, 1850. *Id.* (text copied from originals and printed in 8 Utah Historical Q. 190). We need not set forth their boundaries as originally described in these enactments because, in 1855, the segment of their common boundary at issue in this case was moved by the territorial legislature. In an unequivocal expression of legislative intent, a January 10, 1855, enactment took "all that portion of Weber county south of a line running down the centre of the main channel of the Weber river, to a point due north of the north-west corner of Kingston's fort, thence due west to the Great Salt Lake" and attached it to Davis County. 1855 Territorial Laws of Utah, ch. LXXXV, § 2 (microfilm of handwritten original on file at Utah State Archives).

■ It is this 1855 act, therefore, that established the common boundary of Weber and Davis Counties in the area of the property at issue in this case, by describing it as a line down the center of the main channel of the Weber River. Its operative effect in establishing the counties' geographical limits was not contingent on any survey of the main channel's location on the ground at that time. It is sufficient that the county boundary was described in 1855 with enough certainty that it could have been definitely located on the ground at the time of the enactment. *See Barton v. Sanpete County*, 162 P. at 613. The described line is one down the center of the nonnavigable river's "main channel," which is the bed of the river over which the principal volume of water flowed. *Black's Law Dictionary* 210 (5th ed. 1979). In the context of county boundary definition, where permanence is desirable, the "centre of the main channel" provides a definitely locatable boundary since the riverbed itself has permanent features that are observable even if water does not flow in it year-round and even if the river subsequently changes course and follows a different channel.

■ We therefore conclude as a matter of law that the common boundary between Davis and Weber Counties was established by the territorial legislature in January 1855 as the location of the center of the main channel of the Weber River at that time. The trial court erred insofar as it used the 1866 enactment and the 1866 location of the river's main channel as the relevant temporal and topographical reference points.

## II.

We move next to the question of the location of the six acres claimed by the Baxters in relation to the main channel of the Weber River in 1855. It is clear from the evidence presented at trial, including the expert testimony introduced by UDOT, that the river moved and took different paths through the southwest quarter of Section 25 before 1894. A United States Government Land Office survey of that area was conducted in October 1855, and a map (Exhibit D–14) was drawn based on the field notes. The following notation appears on the face of the map:

This map of Township No. 5 north of Range No. 1 West of Salt Lake Meridian is strictly conformable to the field notes of the survey thereof on file in this office which have been examined and approved.

/s/ David H. Burr

Surveyor General of Utah

The total number of acres surveyed, shown on the map, was 17,032.28. The map depicts the location of the widest channel of the Weber River as it traverses the entire township, including Section 25, as well as a narrow secondary channel in the area of the subject six acres. Both channels run to the north of the property claimed by the Baxters.

In January 1871, further surveying was done in Sections 25, 26, and 36. On April 14, 1871, the Surveyor General's office prepared another map (Exhibit D–16) strictly conformable to the survey field notes, excerpts of which were introduced at trial. The 1871 map depicts the location of the Weber River as it traverses Sections 25 and 26 from east to west. The detail shows three river channels in the northwest qua-

drant of the southwest quarter of Section 25 that continue into Section 26. All three channels are to the north of the property claimed by the Baxters.

In October 1886, additional Government Land Office surveying was done in Sections 25 and 26 and other sections to the north, all located in Township 5 North, Range 1 West. A map prepared from that survey (Exhibit D–15) shows the Weber River's course through Sections 25 and 26 at that time.[4] The detail shows three river channels running to the north of the subject six acres, in virtually the same location as on the 1871 map. Both the 1871 and the 1886 survey field notes found no water in the 26′ wide secondary channel noted in the 1855 survey, describing it as "old river bed."

By the time a survey of the course of the Weber River was conducted in the spring of 1894 at the behest of the Davis County Commissioners, its main channel (indeed, its only channel) was indisputably running east-west to the south of the subject six acres. Nonetheless, the clear weight of the evidence shows that the six acres claimed by the Baxters were south of all channels of the Weber River in 1855 and thereafter until at least 1886;[5] thus, they were within the boundaries of Davis County as described and established in the January 1855 enactment.

## III.

 We next consider whether the physical location of the relevant county boundary was moved after 1855. Once the legislature established the geographical limits of Davis and Weber Counties in January of

---

4. While this matter was under advisement following trial, the district court did not have access to the three Surveyor General maps (Exhibits D–14, D–15, and D–16) because UDOT's counsel removed them from the courtroom. When their absence from the record in this pending appeal was eventually noted, the Utah Supreme Court remanded the case to the trial court for a determination of whether the maps were admitted as evidence at trial. On remand, the trial court determined in June 1987 that the missing maps were received as exhibits. However, UDOT's counsel still did not deliver them to the trial court for inclusion in the record on appeal

after that ruling. Instead, counsel inexplicably retained these critical exhibits and did not relinquish them to us until directed to do so by this court after oral argument.

5. Although the various experts disagreed over whether it was possible to determine from the excerpts of survey field notes which of the channels was the main channel in 1866, there was agreement that the maps and field notes did not show any river water flowing to the south of the subject six acres.

that year, their common boundary remained in the actual location of the center of the main channel of the Weber River at that time unless and until changed to a different location on the ground in accordance with the law. *See Ballard v. W.T. Smith Lumber Co.,* 258 Ala. 436, 63 So.2d 376, 378 (1953); *Franklin Real Estate Co. v. Henderson,* 64 Ohio L.Abs. 83, 110 N.E.2d 817, 820 (1952); *see also Barton v. Sanpete County,* 162 P. at 612. Between 1855 and statehood, the territorial legislature frequently reshaped and redefined the boundaries of counties in the northern third of what is now Utah. *See generally* Allen, *The Evolution of County Boundaries in Utah,* 23 Utah Historical Q. 261, 266–77 (1955). However, there is no indication that it intended to change the geographical limits of Davis and Weber Counties that it had established in 1855.

■ The legislative description of the line separating Davis and Weber Counties did not substantively change in enactments after 1855. In an act of January 17, 1862, the same basic description of Davis County's northern boundary line, but from the opposite direction from that used in 1855, was set out:

All that portion of territory bounded south by Great Salt Lake County, west by the Eastern shore of Great Salt Lake, north by a line running due East from a point in said shore to *a point in the center of the channel of Weber River north from the northwest corner of Kingston's Fort, thence up the center of said channel* [6] to the center of the low-

er canyon of said river, and East by the summit of the Wasatch mountains, is hereby made and named Davis County. *Acts, Resolutions and Memorials of the Territory of Utah 1851–70* 40 (emphasis added) (on file at Utah State Archives). Four years later, the relevant northern boundary line of Davis County was again described as

a line running due east from a point on [the eastern shore of the Great Salt Lake] to a point in the centre of the channel of [the] Weber river due north from the northwest corner of Kingston's Fort, thence up the centre of said channel to a point opposite the summit of the Wasatch mountains ....

1866 Territorial Laws of Utah, ch. CXLVI, § 14; 1876 Compiled Laws of Utah § 156. Weber County was simply described as being bordered on the south by Davis County. *Id.,* § 15; 1876 Compiled Laws of Utah § 157.

In a February 1880 territorial enactment, apparently the last legislation on the subject prior to statehood, the relevant northern boundary of Davis County was again described as a line due east from a described point on the east shore of Great Salt Lake to a point in the center of the channel of the Weber River due north from the northwest corner of Kingston's Fort, "thence up the center of said channel to a point opposite the summit of the Wasatch mountains ...." 1888 Compiled Laws of Utah § 65. The southern boundary of Weber County was again described as being Davis County. *Id.,* § 66.[7]

---

**6.** In the absence of any legislative intent indicating otherwise, we construe the legislature's use of "the center of the channel" and "the center of said channel" in this and all subsequent enactments describing the relevant county boundary as meaning the center of the "main channel" of the river, the phrase used in the 1855 enactment in apparent recognition of the fact that there was more than one river channel at some points. As the Weber County surveyor testified in this case, if a boundary line between counties is described as the center of the channel of a river, that means the center of the main channel of the river. Furthermore, it is standard practice within his profession for a person charged with the job of surveying the channel of a river to determine and follow the main channel if there is more than one.

**7.** By describing the northern Davis County perimeter from the opposite direction, the wording but not the content of the first post-statehood act defining county boundaries varied from that found in some of the earlier enactments. The relevant northern Davis County boundary was still described as a line from a point where the Wasatch range summit line crossed the middle of the channel of the Weber River, "thence westerly down the middle of said channel to a point north of the northwest corner of Kingston's Fort ...." 1898 Rev.Stat. of Utah, title 12, ch. 1, § 464. The same description of the northern Davis County boundary appears in the current statute, Utah Code Ann. § 17–1–9 (1987), and its predecessors since 1898.

Utah's state constitution, adopted by the people in November 1895, went into effect on January 4, 1896, the day it was admitted into the Union. Article XI, § 1 provided:

> The several counties of the Territory of Utah, existing at the time of the adoption of this Constitution, are hereby recognized as legal subdivisions of this State, and the precincts and school districts now existing in said counties, as legal subdivisions thereof, and they shall so continue until changed by law in pursuance of this article.

This constitutional provision was reflected in a post-statehood statute: "The several counties as they are in this chapter named and described are the counties of the state until otherwise changed by law." 1898 Rev.Stat. of Utah, title 12, ch. 1, § 459 (now found at Utah Code Ann. § 17–1–3 (1987)). The new constitution also provided that territory could not be moved from one county into another without the approval of a majority of the voters living in that territory and a majority of those in the county to which the territory was to be annexed.[8] Utah Const. art. XI, § 3.

In sum, there is nothing in the territorial statutes from 1855 through the time of statehood or in the documentary evidence presented at trial to even hint that the legislature intended to move the northern Davis County border from the actual location of the center of the main channel of the Weber River in 1855 to the actual location of the river's course in 1894 or in any year in between.[9]

Nonetheless, UDOT contended successfully in the trial court that, whatever the unsurveyed actual location of the counties' boundary as set by the legislature before 1894, the counties adopted the surveyed location of the river at that time as their boundary pursuant to the authority given them by section 86 of the 1888 Compiled Laws of Utah, quoted in full above, to establish a disputed or uncertain boundary.

According to official minutes introduced at trial, the Davis County Board of Commissioners agreed to commission a map or atlas of that county at their meeting of August 21, 1893. It was to show public roads, school district lines, precinct lines, city and townsite lines, including "Blocks and Lots, Railroads, All Public Streams, Section, ¼ Section and Government lot lines, and all Topographical data as shown by the records of the Surveyor General's Office...." They approved a contract with draftsman E.A. Vail for this work on October 2, 1893. At the same meeting, the clerk was instructed to write to the Weber County Surveyor for "notes of the survey of the Weber River between Weber and Davis Counties." The minutes of a December 26, 1893, Board session documented a complaint by one Timothy Kendall that he had been assessed, and had paid, taxes on one piece of land by both Weber and Davis Counties. On January 15, 1894, the clerk reported to the Board that the Weber County surveyor had informed him he had no notes of a survey of the line between Davis and Weber Counties. He also verified that Timothy Kendall had been double taxed in some undetermined amount "on

In the 1898 statutes, however, the legislature no longer described the relevant southern boundary of Weber County simply as Davis County; instead, it was specifically described as a line from a designated point on the east shore of Great Salt Lake, "thence east to the middle of the channel of Weber river; thence up the middle of said channel to a point where crossed by the summit line of the Wasatch range...." 1898 Rev.Stat. of Utah, title 12, ch. 1, § 486. The same description appears in the current statute, Utah Code Ann. § 17–1–32 (1987), and its predecessors since 1898. It is apparent that the 1898 statute did not alter the southern Weber County boundary, but merely described it from the direction opposite that used in 1898 to describe the northern Davis County boundary.

8. We are aware of no equivalent provision in prestatehood laws or territorial constitutions that would have restricted the legislature's power to move territory from one county to another without voter approval.

9. Even if there were a basis for concluding that the 1866 or 1880 legislatures intended to relocate the relevant boundary to the river's actual location in those years, the clear weight of the evidence shows that, at those times, the subject six acres were still south of the river channels and, thus, within the established boundaries of Davis County.

account of the County line not being properly located...." According to a committee report, completion of Mr. Vail's map was awaiting notes of the Davis/Weber County line and surveys of two other segments of the Davis County perimeter, which the committee considered "a necessary adjunct to the map." The committee's recommendation that surveys of these three lines be conducted so they could be properly located on Mr. Vail's map was approved on January 15, 1894.

There is no further mention of the county boundary until the minutes of the March 19, 1894, board meeting:

> The matter of permanently locating the County line between Davis and Weber Counties was referred to the Surveyor to confer with the authorities of Weber County with a view to permanently locating said line with power to call for such assistance as he may need in the matter.

The board approved a $106 claim by the surveyor of the county line, T.H. Phillips (who was also the Davis County Clerk), on May 7, 1894, and ordered the survey notes recorded. There is no indication in these notes that the surveyors ever consulted the 1855, 1871, and 1886 field notes and maps from the Government Land Office and the Surveyor General or went out onto the land to determine the actual location of the river's main channel when the boundary was established by the legislature. The 1894 survey notes clearly show that Phillips and the Weber County Surveyor simply took the language of the legislature's description of the Davis and Weber County boundary in section 65 of the 1888 Compiled Laws of Utah and proceeded to survey a line from "a point in the center of the channel of the Weber river due north of the northwest corner of Fort Kingston, thence east to the above named point in the center of the channel of the Weber River ... thence up the center of the channel of the Weber River to a point opposite the summit of the Wasatch mountains," the latter point being 80′ north of the center of the river opposite the summit.

As we held in the earlier sections of this opinion, the relevant boundary between Davis and Weber Counties was legislatively established by the January 10, 1855, enactment as the actual location of the center of the main channel of the Weber River at that time, and that boundary was not subsequently moved by legislative enactment. The trial court apparently concluded that, in section 86 of the 1888 Compiled Laws of Utah, the territorial legislature delegated authority to Davis and Weber Counties to disregard that unequivocal and certain 1855 expression of legislative intent and to, in effect, move their common boundary to a new location, i.e., to the physical location of the river in 1894. This conclusion of law underlies the trial court's pivotal factual findings that the 1894 survey "set the river definitely" and that the disputed six acres "is and has always been in Weber county."

On appeal, this court may set aside findings of fact, in actions at equity or in law, only if they are clearly erroneous. *Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896 (Utah 1989); *Barker v. Francis*, 741 P.2d 548 (Utah Ct.App.1987); *see* Utah R.Civ.P. 52(a). A finding is clearly erroneous if it is without adequate evidentiary support or if it was induced by an erroneous view of the law. *State v. Walker*, 743 P.2d 191, 193 (Utah 1987). In determining whether a trial court's finding was thus induced, we give no deference to the trial court's view on issues of law. Instead, we review the trial court's legal conclusions, including its construction of a statute, under a correction-of-error standard. *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1038 (Utah 1989).

We disagree with the trial court's interpretation of the authority given to the counties by section 86. There is evidence of uncertainty in 1894 about where the boundary between Davis and Weber County was actually located on the ground at some points along that boundary that cannot be ascertained from the record evidence. However, although section 86 authorized the county surveyors to locate and mark county boundaries upon the ground in the event of uncertainty or dispute, their statutory authority was expressly limited to the erection of suitable monuments "to

designate said boundaries *as they are now established by law.*" 1888 Compiled Laws of Utah § 86 (emphasis added). We interpret this limitation as a requirement that the surveyors look not just to the legislature's words describing a county line, but to the legislature's intent regarding the actual location of the boundary as "established by law" in 1855. Because the surveyors in 1894 disregarded the actual location of the middle of the abandoned channel followed by the Weber River when the counties' boundary was legislatively established in 1855, their action was invalid as not in compliance with the strictures of section 86. Therefore, the Davis County Commissioners' adoption of the surveyed location of the river in 1894 as the "permanent" boundary [10] (until superceded by legislative enactment) was of no force or effect in moving the northern boundary of Davis County to the location of the river channel in 1894. Thus, the trial court's findings that the 1894 survey "set the river definitely" and that the property at issue here "is and has always been in Weber county," inasmuch as they are the product of the court's erroneous interpretation of section 86, must be set aside as clearly erroneous.

Finally, we consider whether the relevant intercounty boundary moved from the 1855 Weber River location to the 1894 Weber River location by operation of the doctrine of accretion. Accretion is the slow and imperceptible deposit of alluvium or silt on one riverbank and erosion of the other bank that gradually changes the location of the river channel. *City of Lawrence v. McGrew*, 211 Kan. 842, 508 P.2d 930, 932 (1973). Simply put, the doctrine of accretion states that, where a river forms a boundary between counties and property owners, the movement of that boundary river over time through the erosion process works a change in the boundary and, therefore, in the ownership of exposed land that accretes on the side of the river opposite the direction of the river's movement. *See Matthews v. McGee*, 358 F.2d 516, 517 (8th Cir.1966) (applying Arkansas law); *City of Lawrence v. McGrew*, 508 P.2d at 932; *Witter v. County of St. Charles*, 528 S.W.2d 160, 161 (Mo.Ct.App.1975); *Tavis v. Higgins*, 157 N.W.2d 718, 726 (N.D.1968). *See also Arkansas v. Tennessee*, 246 U.S. 158, 173, 38 S.Ct. 301, 304, 62 L.Ed. 638 (1918) (applying accretion doctrine as a matter of federal law to interstate boundary formed by navigable river); *State v. Rolio*, 71 Utah 91, 262 P. 987 (1927) (accretion doctrine applicability not raised by State's complaint setting out lakeshore landowner's claim of title to lake bottomland to center of Utah Lake); *Knudsen v. Omanson*, 10 Utah 124, 37 P. 250 (1894) (applying accretion doctrine as a matter of federal law to determine federal patent grantee's title to newly surfaced Utah Lake bottomland). In contrast, where a boundary river suddenly abandons its channel and occupies a new channel because of natural or manmade forces, the doctrine does not apply. Such a shift is said to be avulsive, and it results in no movement of the county boundary or change in ownership of the land avulsively transferred from one side of the river to the other. *Thomson v. Clarks Inc.*, 162 Colo. 506, 427 P.2d 314, 317 (1967); *City of Lawrence v. McGrew*, 508 P.2d at 932; *Witter v. County of St. Charles*, 528 S.W.2d at 161; *McCafferty v. Young*, 144 Mont. 385, 397 P.2d 96, 99 (1964); *Olsen v. Jones*, 412 P.2d

---

10. Although the Weber County Surveyor and the Davis County Surveyor testified at trial that they regarded the 1894 survey as definitively designating the boundary between Weber and Davis County, that view was obviously not shared by Davis County itself, which had assessed the disputed property as being within its territorial limits from at least 1930, resulting in Davis County's tax deed to Tasma Dansie in June 1938. Furthermore, the Weber County Assessor was still complaining to Weber County Commissioners at a January 4, 1904, meeting about problems in making accurate assessments because the boundary line with Davis County was still unsettled. In a response, one of the commissioners wisely opined that the matter could only be resolved through remedial legislation. In any event, the counties' acquiescence in the 1894 river location as their boundary is immaterial in light of the certain and locatable description employed by the 1855 legislature when it fixed the boundary. *See San Juan County v. Grand County*, 371 P.2d at 857.

162, 167 (Okla.1966); *see Arkansas v. Tennessee*, 246 U.S. at 173, 38 S.Ct. at 304.

Although we are aware of no Utah precedent applying the accretion doctrine as a matter of state law to the movement of intrastate county boundaries, the preliminary issue of its applicability was not contested, briefed, or ruled upon in the trial court. Nor has it been raised on appeal. The trial court simply found that the Weber River's movement to its 1894 location was not avulsive.

Assuming, *arguendo*, that the doctrine of accretion is applicable and relevant to a determination of which county the subject six acres lie in, the trial court's finding on this point must also be set aside as clearly erroneous. The clear weight of the evidence conclusively shows that the Weber River's movement to its 1894 location was not the result of accretion. The river was flowing east-west considerably to the north of the subject six acres as late as October 1886. By the time of the 1894 survey, fewer than eight years later, the river had moved its course entirely to the south of the subject property, which is itself over 400' wide measured from north to south. In the spring of 1894, the river crossed the western border of Section 25 at a point more than 1,500' south of where it had crossed that section line in the earlier Government Land Office surveys. We hold that this drastic shift in such a short time, whereby the river completely changed its course to a new channel due to natural or manmade conditions, constitutes avulsion as a matter of law. *See McCafferty v. Young*, 397 P.2d at 100 (lateral migration of river's channel one-quarter mile in fewer than 100 years, "perceptible over the period of just one generation," would be avulsive even in the absence of clear evidence of a sudden flood). Accordingly, the location of the boundary between Davis and Weber Counties did not, by application of the doctrine of accretion, move with the river from the location of its old channel in 1855 to its location in 1894 south of the property claimed by the Baxters. The disputed six acres is, therefore, within the fixed boundaries of Davis County.

In light of UDOT's failure to establish that the disputed six acres is located within the boundaries of Weber County, which was the factual basis for its defense,[11] the trial court erroneously concluded that the 1969 tax deed from Davis County was invalid. We reverse the judgment below and remand this case to the district court for entry of a judgment quieting title to the property at issue in the Baxters.[12]

BENCH and GREENWOOD, JJ., concur.

---

**11.** Where a defendant in an action to quiet title claims to be the owner of the property and seeks to have title quieted in him, he has the burden of proving the allegations of his claim and, in effect, becomes a party plaintiff. *Tavis v. Higgins*, 157 N.W.2d at 724. *See Gatrell v. Salt Lake County*, 106 Utah 409, 149 P.2d 827 (1944) (once quiet title plaintiff makes a prima facie showing of ownership, defendant has the burden of going forward with proof of his challenge to plaintiff's title).

**12.** See note 2, *supra*.